[No. B179053. Second Dist., Div. Eight. Apr. 28, 2005.]

THE ROMAN CATHOLIC BISHOP OF OAKLAND, etc., Petitioner, v. THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent; BOB THATCHER, Real Party in Interest.

**COUNSEL**

Bledsoe, Cathcart, Diestel & Pedersen, Richard S. Diestel, Alison M. Crane; Foley & Lardner, Stephen A. McFeely; Sedgwick, Detert, Moran & Arnold, Christina J. Imre and Douglas J. Collodel for Petitioner.

No appearance for Respondent.

Furtado, Jaspovice & Simons and Richard J. Simons for Real Party in Interest.

---

**OPINION**

**RUBIN, J.**—The Roman Catholic Bishop of Oakland, a corporation sole (Bishop), petitions for a writ of mandate to preclude plaintiff Bob Thatcher from seeking punitive damages in Thatcher's suit against the Bishop for childhood sexual abuse by one of the Bishop's priests. According to the Bishop, punitive damages in this case violate the ex post facto clauses of the United States and California Constitutions because they are sought only by virtue of a statute that revived the statute of limitations on otherwise barred tort claims for childhood sexual abuse. (Code Civ. Proc., § 340.1.) We hold that the statute does not violate the ex post facto doctrine, and deny the request for extraordinary relief.

## FACTS AND PROCEDURAL HISTORY

■ The statute of limitations for tort claims based on allegations of childhood sexual abuse is found at Code of Civil Procedure section 340.1.[1] Although claims based on liability for failing to take reasonable steps to prevent sexual abuse by others ordinarily have to be brought by the plaintiff's 26th birthday, section 340.1 was amended in 2002 to permit a one-year period for the revival of such abuse claims that had expired under the

---

[1] We will refer to this provision as section 340.1.

previous limitations period. (§ 340.1, subds. (b)(1)–(2), (c); see Stats. 2002, ch. 1499, § 1.) In April 2003, Bob Thatcher sued the Roman Catholic Bishop of Oakland, Bishop John S. Cummins, and Father Robert Ponciroli, a priest who worked for the Bishop of Oakland.[2] According to Thatcher, Ponciroli sexually molested him during the years 1980 through 1981, at a time when Thatcher was a minor. His complaint stated causes of action on several theories of negligent and intentional torts.[3]

In April 2004, the trial court granted Thatcher permission to file a second amended complaint which sought punitive damages against the Bishop. The amended pleading was based on allegations that the Bishop knew Ponciroli was a child molester but took no steps to protect young churchgoers from his advances. Based on those allegations, the new pleading stated causes of action against the Bishop for negligent and intentional misconduct. The Bishop moved to strike the punitive damage claims, contending that because section 340.1 had revived the expired statute of limitations, those claims violated the constitutional prohibitions against ex post facto laws. Although finding the issue to be a close one, the trial court denied the motion because it believed that punitive damages sought as part of a civil law tort claim fell outside the reach of the ex post facto prohibition. The Bishop then filed a writ petition asking us to reverse the trial court's order. We issued an order to show cause why the writ should not be granted.[4]

## DISCUSSION

1. *General Principles of Ex Post Facto Analysis as Applied to Statutes of Limitations*

■ Under both the federal and California Constitutions, the states are barred from passing ex post facto laws. (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.) We interpret the California provision in the same manner

---

[2] Petitioner the Roman Catholic Bishop of Oakland refers to the corporate entity that operates Catholic churches and schools in the Oakland area. We will refer to this entity as the Bishop or, as necessary, as the Bishop of Oakland. John S. Cummins is the individual who serves in the capacity of Bishop and is not hereafter referred to in our opinion.

[3] Thatcher's complaint is one of nearly 60 such cases from the Bay Area. Those cases, along with numerous others from Southern California, have been coordinated in the Los Angeles County Superior Court. The Bay Area cases are known collectively as the *Clergy Cases III.* The Second District of the Court of Appeal has been designated as the intermediate appellate court for the various coordinated cases.

[4] We also note that we refused to stay the trial of this matter, which was scheduled to start on March 7, 2005, and, which we understand, has concluded.

The Bishop has asked us to take judicial notice of the following: Thatcher's third amended complaint, which seeks punitive damages; and Thatcher's memorandum of points and authorities filed in support of that pleading. We hereby grant that request.

as its federal counterpart. (*People v. Superior Court* (2002) 104 Cal.App.4th 915, 926 [128 Cal.Rptr.2d 794].) In American jurisprudence, the seminal definition of the ex post facto clause was supplied by Justice Chase in *Calder v. Bull* (1798) 3 U.S. 386, 390 [1 L.Ed. 648, 3 Dall. 386] (*Calder*): "The prohibition, in the letter, is not to pass any law concerning and after the fact; but the plain and obvious meaning and intention of the prohibition is this; that the Legislatures of the several states, shall not pass laws, after a fact done by a subject, or citizen, which shall have relation to such fact, and shall punish him for having done it." The *Calder* court described the four different types of ex post facto laws: "1st. Every law that makes an action, done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." (*Ibid.*) More recently, and more succinctly, the United States Supreme Court stated that ex post facto laws apply "only to penal statutes which disadvantage the offender affected by them." (*Collins v. Youngblood* (1990) 497 U.S. 37, 41 [111 L.Ed.2d 30, 110 S.Ct. 2715].) According to our highest court: "Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." (*Id.* at p. 43.)

In *Stogner v. California* (2003) 539 U.S. 607 [156 L.Ed.2d 544, 123 S.Ct. 2446], the United States Supreme Court confirmed that the revival of a lapsed criminal law statute of limitations violated ex post facto principles. Because the limitations period acts as a sort of amnesty that might lull a suspected offender into believing it was no longer necessary to preserve exculpatory evidence, legislation reviving a lapsed criminal charge was " 'unfair and dishonest.' " (*Id.* at p. 611 [considering Pen. Code, § 803, subd. (g), which revived the lapsed limitations period for childhood sex abuse prosecutions upon certain conditions].)

█ It is equally well settled that legislation reviving the statute of limitations on civil law claims does not violate constitutional principles. In *Chase Securities Corp. v. Donaldson* (1945) 325 U.S. 304, 314 [89 L.Ed. 1628, 65 S.Ct. 1137], the court held that due process notions were not affected by the revival of a civil law claim because civil limitations periods "find their justification in necessity and convenience rather than in logic. . . . They are by definition arbitrary, and their operation does not discriminate between the just and the unjust claim, or the avoidable and unavoidable delay. . . . Their shelter has never been regarded as . . . a 'fundamental' right . . . the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative

control." (Fns. omitted.) In *Liebig v. Superior Court* (1989) 209 Cal.App.3d 828, 831–834 [257 Cal.Rptr. 574], the court held that the Legislature had the power to revive lapsed common law claims based on childhood sexual abuse under an earlier version of section 340.1. Finally, the court in *DeLonga v. Diocese of Sioux Falls* (D.S.D. 2004) 329 F.Supp.2d 1092, 1100–1102, held in another case based on allegations of childhood sexual abuse by priests that a South Dakota statute reviving lapsed civil actions based on such conduct did not violate the ex post facto doctrine.

We proceed to a description of the unique interplay between the revival of civil claims for punitive damages and the ex post facto clause.

2. *Bishop's Contentions: Applicability of* Landgraf *and* Mendoza-Martinez[5]

■ According to ex post facto doctrine, the fact that a statute is labeled as civil is not dispositive. If the effect of a statute is to impose punishment that is criminal in nature, the ex post facto law is implicated. (*Kansas v. Hendricks* (1997) 521 U.S. 346, 360–361 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*).) Because punitive damages serve much the same function as the criminal law—to both punish and deter[6]—the Bishop contends that section 340.1 violates the ex post facto prohibition to the extent it acts as a vehicle by which Thatcher may claim punitive damages for conduct that at one time was not actionable because it had been barred by the statute of limitations.[7]

According to the Bishop, this case calls for application of the traditional tests for determining whether a statute is valid for ex post facto purposes. First, we should examine the legislative intent to determine whether the Legislature intended to impose criminal punishment. If not, we then are to apply the *Mendoza-Martinez* factors to determine whether the net effect of the statute amounts to criminal punishment.[8] (*Smith v. Doe* (2003) 538 U.S. 84,

---

[5] *Landgraf v. USI Film Products* (1994) 511 U.S. 244, 281 [128 L.Ed.2d 229, 114 S.Ct. 1483] (*Landgraf*); *Kennedy v. Mendoza-Martinez* (1963) 372 U.S. 144 [9 L.Ed.2d 644, 83 S.Ct. 554] (*Mendoza-Martinez*).

[6] In *Landgraf, supra*, 511 U.S. at page 281, the Supreme Court commented that punitive damages share key characteristics with criminal sanctions. Our courts have also observed that punitive damages have nothing to do with compensating a plaintiff for his actual injuries. Instead they serve a public purpose: to punish the wrongdoer, and deter that person and others from similar conduct. (*Adams v. Murakami* (1991) 54 Cal.3d 105, 110 [284 Cal.Rptr. 318, 813 P.2d 1348]; *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323]; see Civ. Code, § 3294, subd. (a) [punitive damages may be recovered "for the sake of example and by way of punishing the defendant"].)

[7] Although the Bishop does not concede that section 340.1 is constitutional even in regard to compensatory damages, it has expressly declined to raise that issue now.

[8] These are: "[w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of

92, 97 [155 L.Ed.2d 164, 123 S.Ct. 1140] (*Smith*); *Hendricks, supra,* 521 U.S. at p. 361.)[9] As discussed below, the Bishop concedes that the Legislature did not intend to impose criminal punishment. (See fn. 17, *post.*) The Bishop contends, however, that under *Mendoza- Martinez,* the *effect* of section 340.1 is to do just that.

In calling forth the *Mendoza-Martinez* factors, the Bishop relies heavily on dicta from *Landgraf, supra,* 511 U.S. 244. The plaintiff in that case sued her employer for sexual harassment under federal civil rights law. When she first sued, the statute provided only for back pay and other equitable relief, but did not provide for compensatory or punitive damages. Although the trial court found the plaintiff had been the victim of sexual harassment, it also found she had not been subjected to a sufficiently hostile environment but instead had voluntarily resigned. Because she did not qualify for equitable relief and because no other relief was then available, the trial court dismissed her action. While the plaintiff's appeal was pending, a new law went into effect that gave sexual harassment plaintiffs the right to a jury trial if they sought compensatory and punitive damages, two forms of relief which had not previously been available. The plaintiff's attempt to revive her action and seek compensatory and punitive damages was denied. On appeal, the issue before the Supreme Court was whether Congress intended the new provision to have retroactive effect. As part of its discussion, the court noted that concerns over statutory retroactivity were expressed through different constitutional theories, including the ex post facto clause, and others. (*Id.* at pp. 265–266.) In determining whether Congress intended the new remedies to be retroactive, the court examined the new punitive damage provision. Because such damages share much in common with criminal sanctions, the court observed that their retroactive imposition would raise a serious constitutional question. (*Id.* at p. 281.) Ultimately, the court concluded Congress did not intend the amendments to apply retroactively. (*Id.* at p. 286.)

The Bishop uses this language from *Landgraf* to contend that punitive damages are criminal in nature and would likely be held to violate ex post facto doctrine under *Mendoza-Martinez.* We reject the Bishop's reliance on that decision for several reasons. First, before it could consider the ex post

---

scienter, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . ." (*Mendoza-Martinez, supra,* 372 U.S. at pp. 168–169, fn. and italics omitted.)

At issue in *Mendoza-Martinez* was a federal statute that stripped draft evaders who remained outside the United States of their citizenship. The statute did not provide for a trial but instead authorized immediate deportation in the event of their return to this country. The decision addresses the nature of punishment but does not involve the ex post facto doctrine.

[9] We will refer to this two-part test as the intent-effects test.

facto issue, the *Landgraf* court said it "would have to be confronted with a statute that explicitly authorized punitive damages for preenactment conduct." (*Landgraf, supra,* 511 U.S. at p. 281.) The court did not reach the issue that is before us now, and the language relied on by the Bishop is therefore dicta. In fact, the court said earlier that for its purposes it would presume that Congress could make the new law retroactive if it wanted to. (*Id.* at p. 268, fn. 21.) Next, the decision is inapplicable in two ways: (1) although the court discussed its ex post facto concerns, those were merely part of its overall retroactivity analysis. At issue in *Landgraf* was proof of Congress's intent to make a new law retroactive, not whether that law violated the ex post facto clause; (2) to the extent ex post facto concerns were implicated by *Landgraf,* they are substantially different from those at issue here. *Landgraf* did not concern a common law tort claim. Instead, it concerned the retroactive application of a new *statutory* punitive damage remedy to preexisting conduct which occurred at a time when no such damages were recoverable. This distinction animated the *Landgraf* court's analysis: "In cases like this one, in which prior law afforded no relief, [the new law] can be seen as creating a new cause of action, and its impact on parties' rights is especially pronounced." (*Id.* at p. 284.) As a result, the new statute resembled "a statute increasing the amount of damages available under a preestablished cause of action." (*Id.* at p. 283.) Neither *Landgraf* nor the cases it cites concerned or considered the ability to recover punitive damages as part of a statute reviving a time-lapsed common law tort cause of action. (See *Usery v. Turner Elkhorn Mining Co.* (1976) 428 U.S. 1 [49 L.Ed.2d 752, 96 S.Ct. 2882] [award of benefits under federal Coal Mining Health and Safety Act]; *De Veau v. Braisted* (1960) 363 U.S. 144 [4 L.Ed.2d 1109, 80 S.Ct. 1146] [New York State Waterfront Commission Act precluding convicted felons from collecting or receiving union dues]; *Louis Vuitton S.A. v. Spencer Handbags Corp.* (2d Cir. 1985) 765 F.2d 966 [treble civil damages under criminal trademark counterfeiting law].)[10]

 At issue here, however, is the revival of a lapsed civil limitations period in order to restore common law remedies that actually existed at the time of the alleged misconduct. As noted, numerous federal and California decisions have held that there is no constitutional impediment to such legislation. In light of those decisions, and in the absence of any such issues or discussion in *Landgraf,* we do not believe *Landgraf* can be read as having

---

[10] The same is true of other decisions relied on by the Bishop. (*Burgess v. Salmon* (1878) 97 U.S. 381, 385 [24 L.Ed. 1104] [considering retroactive effect of new tobacco tax impound]; *Fletcher v. Peck* (1810) 10 U.S. 87, 137–138 [3 L.Ed. 162] [considering act of Georgia Legislature annulling earlier land grants, thus divesting subsequent good faith purchasers of title; although ex post facto was relied on, the case extensively discussed the constitutional prohibition against impairing contracts and is best viewed through that prism].)

any applicability here.[11] Instead, as we explain below, we hold that a statute reviving the limitations period for a common law tort cause of action, thereby allowing the plaintiff to seek punitive damages, does not implicate the ex post facto doctrine and therefore does not trigger the intent-effects test at all.

3.  *Ex Post Facto Principles Are Inapplicable to Revival of Common Law Punitive Damages Claims*

■   As part of Justice Chase's standard-setting discussion of the ex post facto clause in *Calder, supra,* 3 U.S. 386, he said that the clause was not "inserted to secure the citizen in his private rights, of either property, or contracts." (*Id.* at p. 390.) No reported decision of any federal or state court has ever held that punitive damages awarded pursuant to a common law tort claim might constitute criminal punishment under the ex post facto clause.[12] Our courts and others have held just the opposite. In *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757 [174 Cal.Rptr. 348] (*Grimshaw*), the defendant auto maker contended that punitive damages for an automotive design defect violated the ex post facto clause because at the time the cars were manufactured it had no warning that such damages might be recoverable under Civil Code section 3294. The appellate court rejected that notion with little discussion, finding it without merit because the doctrine "extends to criminal statutes and penalties, not to civil statutes." (*Id.* at p. 811.) *Grimshaw's* holding was endorsed in *Peterson v. Superior Court* (1982) 31 Cal.3d 147 [181 Cal.Rptr. 784, 642 P.2d 1305] (*Peterson*), where our Supreme Court considered whether plaintiffs injured by drunken drivers were entitled to retroactive application of a judicial decision allowing punitive damage awards against the defendants who caused their injuries. Even though the ex post facto doctrine is not applicable to judicial decisions, the plaintiff advanced an argument based on that theory. Citing to some of the same decisions relied on in *Grimshaw,* the *Peterson* court held that although punitive damages can be viewed as a type of punishment, the ex post facto doctrine did not apply to cases "presenting the possible exposure to civil

---

[11] The Bishop points to language in *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 839–846 [123 Cal.Rptr.2d 40, 50 P.3d 751] (*Myers*), where our Supreme Court took notice of *Landgraf's* language concerning punitive damages and ex post facto law. At issue in *Myers* was the immunity of tobacco companies from certain products liability suits and the statutory repeal of that immunity. Punitive damages were not at issue, and we decline to speculate on whether our Supreme Court is of the view that *Landgraf* has any application to an ex post facto argument to a claim for punitive damages arising out of a common law tort.

[12] We recognize the trend toward increasing judicial skepticism of punitive damage awards, and acknowledge recent decisions that have sought to rein in the size of such awards and establish fair procedures for juries to follow under constitutional due process principles. (See *State Farm Mut. Automobile Ins. Co. v. Campbell* (2003) 538 U.S. 408 [155 L.Ed.2d 585, 123 S.Ct. 1513]; *BMW of North America, Inc. v. Gore* (1996) 517 U.S. 559 [134 L.Ed.2d 809, 116 S.Ct. 1589] (*Gore*).) Those policy considerations are not at issue here and are therefore not applicable to our decision.

penalties." (*Peterson, supra,* at p. 161.) In *Logan v. Drew* (N.D.Ill. 1992) 790 F.Supp. 181, the court considered whether punitive damages in a federal civil rights claim against two police officers (42 U.S.C. § 1983) violated the ex post facto doctrine. Because the federal statute was intended to create a species of tort liability, the district court held that the ex post facto clause did not apply. (*Id.* at p. 183.) None of these cases considered or even mentioned the type of intent-effect analysis required by *Mendoza-Martinez.* Instead, they quickly disposed of the defendants' ex post facto arguments on the ground that the doctrine had no application to civil remedies.

Our conclusion is bolstered by language from the analogous context of the double jeopardy clause of the Fifth Amendment to the United States Constitution. The clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." It protects against only "multiple *criminal* punishments for the same offense." (*Hudson v. United States* (1997) 522 U.S. 93, 99 [139 L.Ed.2d 450, 118 S.Ct. 488] (*Hudson*), original italics.) Whether a punishment is criminal under the double jeopardy clause turns on exactly the same test used to determine whether a punishment is civil or criminal for ex post facto purposes: the two-part test of legislative intent and the *Mendoza-Martinez* factors. (*Id.* at pp. 99–100; *Smith, supra,* 538 U.S. at p. 97 [*Mendoza-Martinez* factors "migrated" to ex post facto cases from double jeopardy jurisprudence]; *Hendricks, supra,* 521 U.S. at pp. 361–370 [court held that its determination that no ex post facto violation occurred under *Mendoza-Martinez* factors also meant that no second prosecution occurred for double jeopardy purposes]; *U. S. v. O'Neal* (4th Cir. 1999) 180 F.3d 115, 122, fn. 7 [same test applies to both double jeopardy and ex post facto claims].) Therefore, if a punishment is not criminal for purposes of double jeopardy, it cannot be criminal under the ex post facto clause. (See *Myrie v. Commissioner* (3d Cir. 2001) 267 F.3d 251, 255 [double jeopardy and ex post facto share common thread: they apply to only punishments or fines that are criminal, not civil, in nature].)

In *United States v. Halper* (1989) 490 U.S. 435 [104 L.Ed.2d 487, 109 S.Ct. 1892] (*Halper*), the Supreme Court deviated from the *Mendoza-Martinez* factors and held that civil claims seeking statutory penalties that were brought by the federal government under the federal False Claims Act were barred under the double jeopardy clause by the defendant's earlier criminal conviction for Medicare fraud. That approach was later overturned in *Hudson, supra,* 522 U.S. 93, which reaffirmed the vitality of the *Mendoza-Martinez* factors. Even though the *Halper* court took a more restrictive and now outdated view of punishment under the double jeopardy clause, that court was still intent on making a distinction between the federal false claims statute and common law torts: "Finally, nothing in today's opinion precludes a private party from filing a civil suit seeking damages for

conduct that previously was the subject of criminal prosecution and punishment. *The protections of the Double Jeopardy Clause are not triggered by litigation between private parties.*" (*Halper, supra,* at p. 451, fn. omitted, italics added.)

Other courts have reached the same result. (*U. S. v. Ely* (9th Cir. 1997) 142 F.3d 1113, 1121 [bank directors indicted for federal bank fraud contended prosecutions were barred under double jeopardy clause due to earlier civil suit by the Federal Deposit Insurance Corporation (FDIC); because government sued in its capacity as the bank's receiver, the civil suit seeking compensatory and punitive damages did not have double jeopardy effect]; *Racich v. Celotex Corp.* (2d Cir. 1989) 887 F.2d 393, 397 (*Racich*) [double jeopardy protections not triggered by punitive damage claims in common law tort actions for asbestos exposure]; *Shore v. Gurnett* (2004) 122 Cal.App.4th 166, 171–172 [18 Cal.Rptr.3d 583] [defendant convicted of vehicular manslaughter for drunken driving was sued for wrongful death, where punitive damages were awarded; double jeopardy not implicated by purely private litigation]; *Lemer v. Boise Cascade, Inc.* (1980) 107 Cal.App.3d 1, 7 [165 Cal.Rptr. 555] [class action settlement did not raise double jeopardy bar to separate fraud action]; *Toole v. Richardson-Merrell, Inc.* (1967) 251 Cal.App.2d 689, 716–717 [60 Cal.Rptr. 398] [drug maker's earlier no contest pleas to federal charges did not raise double jeopardy bar to award of punitive damages in later common law tort claim; although punitive damages were sought, the action was still purely civil in nature].) As with the ex post facto cases mentioned earlier, these decisions simply found the analogous double jeopardy clause inapplicable without engaging in any intent-effects analysis.[13]

█ The Supreme Court has also found no impediment to common law punitive damage claims in other constitutional contexts. In *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.* (1989) 492 U.S. 257 [106 L.Ed.2d 219, 109 S.Ct. 2909] (*Browning-Ferris*), the court considered whether the Eighth Amendment's proscription against excessive fines applied to awards of punitive damages in cases between private parties. Given the legislative history and original intent of the clause, the court concluded that it was concerned solely with governmental action and had no application to suits between private parties. (*Id.* at pp. 271–276.) Even though punitive damages are imposed through the courts, serve to advance governmental interests, and advance traditional criminal law interests of punishment and deterrence, because they are based on private civil actions, they are "too far

---

[13] The Ninth Circuit in *United States v. Ely, supra,* 142 F.3d at p. 1121, actually mentioned the intent-effects analysis, but only as an alternative holding and only in passing, without discussion or analysis.

afield from the concerns that animate the Eighth Amendment." (*Id.* at p. 275; see also *Racich, supra,* 887 F.2d at p. 397 [language in *Browning-Ferris* supports holding that punitive damages do not violate double jeopardy clause].)[14]

Finally, and perhaps most tellingly, the Supreme Court's decision in *Gore, supra,* 517 U.S. 559, confirms our belief that the ex post facto doctrine does not apply here. In a case which sought to rein in the size of punitive damage awards, the court linked its ruling to other constitutional provisions which ensure that a person will receive fair notice of the conduct that might expose him to punishment, along with the nature of the penalty for that conduct. Among these was the ex post facto doctrine. However, as the court noted, these "strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases, [although] the basic protection against 'judgment without notice' afforded by the Due Process Clause [citation], is implicated by civil *penalties*" (*Id.* at p. 574, fn. 22, original italics.)

■ We recognize that even a common law tort claim for punitive damages involves some level of government action. The courts—the forum for their resolution—are established by the government and are operated through the government's judicial officers. The procedures for litigating such claims, including statutes of limitations, are determined by legislatures. The mechanisms for enforcing a civil judgment are also established by the government. These can sometimes set in motion a series of judicial actions, including judgment debtor examinations and other discovery methods (Code Civ. Proc., §§ 708.010–708.030), wage garnishment (Code Civ. Proc., § 706.010 et seq.), and the forced sale of personal and real property. (Code Civ. Proc., §§ 695.010, subd. (a), 697.310, 697.510, 699.710.) These are essentially neutral administrative functions, however. None transmutes the underlying common law right into some form of criminal punishment. (See *Browning-Ferris, supra,* 492 U.S. at p. 275 [even though common law punitive damages are imposed through the court, their private nature fails to implicate the Eighth Amendment's excessive fines clause].) At bottom, we believe that the cases we have cited in this part of our discussion, such as

---

[14] Earlier in its decision, the court said that punitive damages in a purely private civil suit do not violate the Eighth Amendment "when the government neither has prosecuted the action nor has any right to receive a share of the damages awarded." (*Browning-Ferris, supra,* 492 U.S. at pp. 263–264.) The Bishop points out that effective as of August 2004, Civil Code section 3294.5 provides that the state will take three-fourths of all punitive damage awards. What the Bishop fails to mention is that the statute was enacted as an urgency measure to help ameliorate the state's budget crisis. (Civ. Code, § 3294.5, subd. (a).) The legislation expires in July 2006 (Civ. Code, § 3294.5, subd. (i)), and is not to be construed or interpreted "in any way to establish any policy, precedent, presumption, or inference in any case or in any other setting . . . ." Under these circumstances, we do not believe that the new law has any effect on our analysis.

*Gore, supra,* 517 U.S. at pages 574–575, footnote 2, *Browning-Ferris, supra,* 492 U.S. at page 275; *Halper, supra,* 490 U.S. at page 451, and *Grimshaw, supra,* 119 Cal.App.3d at page 811, stand for the proposition that despite certain similarities with criminal sanctions, punitive damages arising from common law causes of action possess and retain a quintessentially civil flavor. That flavor keeps them outside the zone of constitutional protections such as double jeopardy and the ex post facto clause, which are intended to protect citizens against government-imposed sanctions.[15]

4. *Even Under* Mendoza-Martinez, *the Punitive Damages Claim Here Is Not Criminal Punishment*

■ We alternatively hold that even under the intent-effects analysis, section 340.1 does not violate the ex post facto clause.[16] In considering the validity of a statute for ex post facto purposes, we must determine whether the Legislature meant to establish or affect civil proceedings or, by intention or practical effect, imposed criminal punishment. (*Smith, supra,* 538 U.S. at p. 92 [holding that Alaska's registration scheme for convicted sex offenders was not an ex post facto law].) Whether a statutory scheme is civil or criminal under the ex post facto doctrine is first of all a question of statutory construction. We consider the statute's text and structure to determine the legislative objective. If we conclude that the statute as applied retroactively was intended to punish, then our inquiry is over and we will find an ex post facto violation. (*Id.* at pp. 92–93.) Although the manner of codification and the statute's placement in a civil or criminal code are not dispositive, they are strong indicators of the Legislature's intent. (*Id.* at pp. 93–94.) Section 340.1 is found in our Code of Civil Procedure in a chapter prescribing the limitations periods for a variety of common law and other civil causes of

---

[15] There are sound policy reasons for doing so. In the double jeopardy context, for example, holding that common law punitive damages implicate that clause creates the risk of barring a criminal prosecution if punitive damages were awarded in a tort action completed before the prosecution began. (*Shore v. Gurnett, supra,* 122 Cal.App.4th at p. 176.) Given the symbiotic analytical connection between ex post facto and double jeopardy jurisprudence, holding that common law punitive damage awards are punishment under the former would inexorably lead to reversing years of contrary decisions in the double jeopardy arena.

[16] Shortly before we filed this decision, our colleagues in Division Three issued their opinion in *21st Century Ins. Co. v. Superior Court* (2005) 127 Cal.App.4th 1351 [26 Cal.Rptr.3d 476], holding that punitive damages awarded against an insurer pursuant to legislation reviving insurance bad faith claims arising from the 1994 Northridge Earthquake (Code Civ. Proc., § 340.9) do not violate the ex post facto doctrine. Unlike our primary holding in this case, that court did not hold that the ex post facto doctrine simply does not apply to common law tort claims for punitive damages. Instead, it held that punitive damages do not amount to criminal punishment under *Mendoza-Martinez.* We find our colleagues' analysis compelling as it applies to our similar, alternative holding and have borrowed the opinion's "intent-effects" nomenclature. If that decision were final, we would likely deem it conclusive in this case as well. Until then, we reach our own independent conclusions under *Mendoza-Martinez.*

action. (Code Civ. Proc., §§ 335–349.4.) That chapter, in turn, is contained in a title of the Code of Civil Procedure which is ·called Of The Time Of Commencing Civil Actions. (Code Civ. Proc., pt. 2, tit. 2.) Section 340.1 is, by its terms, applicable to "action[s] for recovery of damages suffered as a result of childhood sexual abuse . . . ." (§ 340.1, subd. (a).) The companion revival of otherwise barred criminal proceedings for child molesters was found in Penal Code section 803, subdivision (g), the statute found unconstitutional in *Stogner*. Based on this, we conclude that the Legislature did not intend to impose punishment of a criminal nature.[17]

■ Despite the Legislature's clear intent to establish civil, not criminal proceedings, we will find an ex post facto violation if the statutory scheme is so punitive in purpose or effect that it negates the Legislature's intentions. This requires the "clearest proof," however. Only "[i]n those limited circumstances[will we] consider the statute to have established criminal proceedings for constitutional purposes." (*Hendricks, supra,* 521 U.S. at p. 361). According to the Bishop, because punitive damages share certain characteristics in common with criminal punishment, they satisfy this standard.[18] As set forth below, we disagree.

In analyzing whether the revival of punitive damages under section 340.1 creates an essentially criminal proceeding, we refer to the seven factors noted in *Mendoza-Martinez*, which we have quoted verbatim in footnote 8, *ante*. (*Smith, supra,* 538 U.S. at p. 97.) Because these factors apply in various constitutional contexts, they are " 'useful guideposts' " and are not " 'exhaustive [or] dispositive.' " (*Smith, supra,* at p. 97.)

■ The first *Mendoza-Martinez* factor asks whether punitive damages impose an affirmative disability or restraint. Imprisonment is the paradigmatic restraint. (*Smith, supra,* 538 U.S. at p. 100.) *Mendoza-Martinez* itself is an affirmative disability case, as a citizen was stripped of his citizenship. (*Mendoza-Martinez, supra,* 372 U.S. at p. 170, fn. 23 [" 'There are many ways in which a man might lose his freedom . . . .' "].) Civil monetary penalties and loss of one's occupation, on the other hand, are not affirmative

---

[17] In fact, section 340.1 does not even mention punitive damages. It simply states that certain claims for damages for childhood sex abuse that have expired are revived, giving plaintiffs one year to commence a "cause of action." (§ 340.1, subd. (c).) Even though the Bishop concedes that the language of section 340.1 evinces no legislative intent to punish, the Bishop apparently contends that the Legislature's omission of punitive damages from the statute somehow shows that such damages were not included within the scope of that provision. We disagree. (*Racich, supra,* 887 F.2d at p. 396 [New York statute reviving tort law asbestosis claims did not mention punitive damages; because the limitations period on common law tort claims was revived, and because such claims necessarily include the element of damages, punitive damages were allowed].)

[18] See footnote 6, *ante*.

disabilities or restraints. (*Ibid.*; *Hudson, supra,* 522 U.S. at p. 104; *United States v. Ward* (1980) 448 U.S. 242, 249–250 [65 L.Ed.2d 742, 100 S.Ct. 2636].) Much the same as civil penalties, punitive damages impose neither an affirmative disability nor any restraint.

Our second inquiry is to determine whether common law punitive damages have historically been regarded as criminal punishment. Although it is true, as discussed earlier, that punitive damages are designed to impose punishment, we do not believe they amount to criminal punishment for ex post facto purposes. In *State Farm Mut. Automobile Ins. Co. v. Campbell, supra,* 538 U.S. at page 417, the court noted that even though punitive damages "serve the same purposes as criminal penalties, defendants subjected to punitive damages in civil cases have not been accorded the protections applicable in a criminal proceeding." The court in *Gore, supra,* 517 U.S. at pages 574–575, footnote 22, observed that the constitutional protections afforded a criminal defendant, including the ex post facto clause, were not applicable to civil cases. And, as noted earlier, litigation between private parties does not trigger the double jeopardy clause (*Halper, supra,* 490 U.S. at p. 451) and punitive damages do not offend the excessive fines clause. (*Browning-Ferris, supra,* 492 U.S. at p. 275.) Based on these authorities, we conclude that an award of common law punitive damages has not been historically regarded as criminal punishment.

The third and fourth factors question whether the sanction comes into play only on a finding of scienter and whether its operation promotes the traditional aims of punishment-retribution and deterrence. As the Bishop points out, an award of punitive damages first requires a finding of scienter-malice, fraud, or oppression. (Civ. Code, § 3294, subd. (a).) And, as discussed above, punitive damages are intended to promote the traditional aims of punishment.

The fifth factor concerns whether the behavior to which the statute applies is already a crime. The revival portion of section 340.1 at issue here does not apply to the actual molester. Instead, it applies to those who violated a tort law duty to safeguard others from the molester. As such, the Bishop of Oakland's liability does not rest on any criminal violations.

· The sixth factor asks whether a rational, alternative purpose can be assigned to the sanction. In this case, punitive damages are allowed solely by virtue of the revival portion of section 340.1. The broad intention of this statute is to allow compensation for certain sex abuse victims, not to impose punishment. That aspect of the revival that permits claims for punitive damages, however, implicates Civil Code section 3294, which allows punitive damages "for the sake of example and by way of punishing the defendant."

Although punitive damages have the concomitant effect of encouraging aggrieved persons to sue for their compensatory damages, the primary import of punitive damages is to punish and deter.

The seventh factor concerns whether the sanction of punitive damages is excessive when compared to that alternative rational purpose. Because punitive damages are not automatic and can only be awarded upon a finding of the requisite mental state, and because there are constitutional safeguards limiting the size of such awards, we do not believe they are necessarily excessive when compared to the ancillary purpose of facilitating claims for compensatory damages.

With these factors in mind, we conclude the Bishop has failed to supply the "clear proof" required to convince us that punitive damages sounding in common law tort are punishment for ex post facto purposes under *Mendoza-Martinez*. The Bishop's argument rests primarily on the punitive and deterrent aspects of punitive damages and the fact that a finding of scienter is required to impose such damages. However, the *Mendoza-Martinez* factors are merely guideposts for us to follow. When balanced against the other factors, we conclude that an award of punitive damages pursuant to a claim brought under section 340.1 does not amount to criminal punishment even under *Mendoza-Martinez*. As discussed above, common law punitive damages have not traditionally been regarded as criminal punishment. Perhaps most critical, the underlying conduct which forms the basis of the Bishop of Oakland's alleged liability is not criminal. The Bishop of Oakland did not molest Thatcher and is accused of committing no crime. Instead, its liability rests solely on proof that it failed to prevent criminal conduct by one of its priests. (See *Hendricks, supra,* 521 U.S. at p. 362 [civil commitment order for convicted sexual abuser based on finding he was a sexual predator was not punishment under double jeopardy because culpability was not affixed as retribution for prior criminal conduct; absence of criminal responsibility suggests the state did not seek retribution for a past misdeed].) That is the thrust of the part of section 340.1's revival provision applicable here, which, by its terms, extends to those who failed to take steps to stop a molester. (§ 340.1, subds. (b)(2), (c).) Because in this context the revival portion of section 340.1 is aimed solely at noncriminal conduct, we believe the provision cannot be deemed criminal punishment, even to the extent it allows punitive damage awards.[19]

---

[19] Although this factor acts as a thumb on the scales of justice, we want to make clear that it is not dispositive. Our decision should not be read one way or the other as indicating how we might hold if the ex post facto argument were advanced by someone who allegedly committed a criminal violation.

## DISPOSITION

For the reasons set forth above, the petition for writ of mandate is denied. Real party in interest to recover his costs on appeal.

Cooper, P. J., and Flier, J., concurred.

Petitioner's petition for review by the Supreme Court was denied July 27, 2005. Werdegar, J., was of the opinion that the petition should be granted.