Filed 9/21/22  P. v. Gonzalez CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>RUBEN MORALES GONZALEZ, JR.,<br><br>　　　Defendant and Appellant. | A158781<br><br>(Contra Costa County<br>　Super. Ct. No. 5-180223-0) |

After a jury convicted defendant Ruben Morales Gonzalez, Jr. of multiple counts of felony child abuse involving his three nieces—Jane Doe 1, Jane Doe 2, and Jane Doe 3—the court sentenced him to state prison for a determinate term of 18 years, eight months, and a consecutive indeterminate term of 695 years to life.  On appeal, Gonzalez argues that the testimony of his adult daughter (Jane Doe 4) was improperly coerced in violation of his constitutional due process rights.  He additionally asserts that the trial court erred in admitting evidence under Evidence Code section 1108 regarding uncharged acts of sexual abuse involving Jane Doe 4.  Gonzalez also claims the prosecutor erred in her closing arguments, improperly lowering the applicable standard of proof.  And he raises ineffective assistance of counsel

1

claims in connection with his evidentiary and prosecutorial misconduct concerns. Finally, Gonzalez maintains that his lengthy sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment and state constitutional law. We affirm.

## I. BACKGROUND

In February 2018, the Contra Costa County District Attorney filed an information charging Gonzalez with 47 counts of felony child abuse with respect to his three nieces, Jane Doe 1, Jane Doe 2, and Jane Doe 3. Counts 1 through 27 involved Jane Doe 1 and alleged that, between January 9, 2002, and January 8, 2012, Gonzalez committed nine counts of aggravated sexual assault of a child—oral copulation (Pen. Code,[1] §§ 269, subd. (a)(4), 287 [or former 288a], (c)(2), (c)(3), (d), counts 1, 4, 7, 9, 11, 14, 17, 20 and 21); three counts of aggravated sexual assault of a child—sexual penetration (§§ 269, subd. (a)(5), 289, subd. (a), counts 2, 13, and 22); two counts of aggravated sexual assault of a child—rape (§§ 261, subds. (a)(2), (a)(6), 269, subd. (a)(1), counts 3 and 23); and 13 counts of forcible lewd act upon a child (§ 288, subd. (b)(1), counts 5, 6, 8, 10, 12, 15, 16, 18, 19, and 24–27).

Counts 28 through 34 involved Jane Doe 2 and alleged that, between March 21, 2004, and March 20, 2016, Gonzalez committed one count of aggravated sexual assault of a child—oral copulation (§§ 269, subd. (a)(4), 287 [or former 288a], (c)(2), (c)(3), (d), count 31); five counts of forcible lewd act upon a child (§ 288, subd. (b)(1), counts 28–30, 32, and 33); and one count of lewd act upon a child (§ 288, subd. (c)(1), count 34).

Counts 35 through 47 involved Jane Doe 3 and alleged that, between January 2, 2005, and January 1, 2015, Gonzalez committed one count of

---

[1] All statutory references are to the Penal Code unless otherwise specified.

aggravated sexual assault of a child—oral copulation (§§ 269, subd. (a)(4), 287 [or former 288a], (c)(2), (c)(3), (d), count 43); one count of aggravated sexual assault of a child—sexual penetration (§§ 269, subd. (a)(5), 289, subd. (a), count 44); one count of aggravated sexual assault of a child—rape (§§ 261, subds. (a)(2), (a)(6), 269, subd. (a)(1), count 41); eight counts of forcible lewd act upon a child (§ 288, subd. (b)(1), counts 35, 36, 39, 40, 42, and 45–47); and two counts of oral copulation or sexual penetration with a child ten years of age or younger (§ 288.7, subd. (b), counts 37 and 38).  Each of the 26 counts involving forcible lewd acts upon a child (counts 5, 6, 8, 10, 12, 15, 16, 18, 19, 24 through 30, 32, 33, 35, 36, 39, 40, 42, and 45 through 47) was enhanced by allegations under section 667.61, subdivisions (e)(4) and (j)(2) that the child was under the age of 14 and Gonzalez committed the alleged acts against more than one victim.

Jury trial in this matter took place over 11 days in March 2019.  The following evidence was adduced by the prosecution at trial.  The defense presented no evidence or witnesses.

**A.     *Jane Doe 1***

Jane Doe 1 was born in January 1998.  At the time of trial, when not at college, she stayed at her family residence on Hemleb Court with her father; her sister, Jane Doe 2; two aunts, A.M. and Al.M. (her mother's sisters); and several cousins, including Jane Doe 3, whose mother is Al.M.  Gonzalez is her uncle, A.M.'s long-term partner.  Growing up, Gonzalez was like a second father to her, and she spent a lot of time with him while her father was working.  Gonzalez did not originally live with her.  She was about four or five when he began to touch her in a sexual way.  At that time, she was living in a house on Sunnyview Drive.  They call that house the "rat house" because

3

there were always mice.  The family moved to a house on East Meadow Drive when she was approximately six years old and lived there until she was nine.

Between the ages of four and nine, Gonzalez touched her on her chest, legs, and inside and outside of her vagina "more than 20 times."  During that same timeframe, Gonzalez put his mouth on her vagina more than five times.  Gonzalez would take her into another room and tell her to close her eyes or blindfold her with a rag, tee shirt, or blue goggles with a clear strap.  He also had her touch his penis at least 20 times.  Gonzalez would tell her to swing his penis like a tennis racket, because she played tennis at the time.  Jane Doe 1 was confused, scared, and knew it was wrong, but she felt she had to do it, or she would get in trouble.

Gonzalez also had Jane Doe 1 put her mouth on his penis at least five times during this period.  She remembered one specific incident where he took her out in his car to go to a car lot.  They stopped across from Sunnyview Drive near a Fosters Freeze.  Gonzalez told her to get in the back seat and close her eyes.  He offered her chocolate but put his penis in her mouth and told her they would not leave, and she would not get her chocolate, until she swallowed.  He ejaculated and she swallowed.  Between the ages of four and nine, Gonzalez additionally put his penis on her vagina, rubbing it, at least 20 times.  When she lived at the house on East Meadow, Gonzalez put his penis in her vagina.  She remembered it hurting.  Gonzalez would also have her touch his penis or orally stimulate him while he was driving.  Sometimes other children were in the car, and she worried they would see and get scared.

All of these types of incidents seemed "normal" to her.  It was like a "daily routine" until she turned 17, graduated, and went to college.  Gonzalez told her not to tell anybody and trained her how to answer any questions that

4

were asked. She specifically remembered one time when Gonzalez took her and her cousin Neal to his house. Gonzalez first took Neal into the bedroom, stating "he was going to teach him to swing a tennis racket." Then, it was her "turn," and Jane Doe 1 went in the bedroom, where she was either blindfolded or with closed eyes, while touching Gonzalez's penis. He told her to hold it and swing it like a tennis racket. She also put her mouth on his penis and had to swallow before she could go home. In addition, Gonzalez touched her vagina with his mouth and penis. She wanted to leave, bult felt that if she tried to fight back, she would be hurt. She never talked to Neal about the incident because he has special needs, and she didn't want to "stress him out."

On New Year's Eve in 2007 when she was nine, the family was at the East Meadow house. Gonzalez approached Jane Doe 1 and told her that her father needed her in the bedroom. As she was walking towards the bedroom, Gonzalez grabbed her and pulled her into the bathroom. Gonzalez started touching her, had his hand in his pants, and was starting to undress her when Jane Doe 4 knocked on the door. Gonzalez told Jane Doe 1 to get in the shower and not move or say anything. He pretended to use the bathroom and walked out. Jane Doe 4 found her and asked what she was doing. She began to cry and ran into the bedroom, where Gonzalez found her and cautioned her not to "say anything to anybody." However, later that evening she did tell A.M. that Gonzalez had been touching her and doing inappropriate things with her. A.M. stated she would talk to Gonzalez and "fix things," but "nothing really changed." They moved to the Hemleb house when she was almost 10 with A.M. and Gonzalez.

Jane Doe 1 remembered being in the car with Gonzalez and Jane Doe 3 when Jane Doe 3 was in the front seat. She saw Gonzalez touch Jane Doe 3

5

and she "would kind of see her hands or her arm lean over to his side." She also noticed Gonzalez calling Jane Doe 2 and Jane Doe 3 into another room. When Jane Doe 1 was 10 or 11 years old, Jane Does 2 and 3 told her they had also been molested by Gonzalez but didn't give specific details. Jane Doe 1 again reported what was going on to A.M.

Between the ages of 9 and 13, Gonzalez would continue to touch her, take her clothes off, and make her touch him. He put his mouth on her vagina at least five times. She had to put her mouth on his penis at least five times, he touched her vagina with his hand at least 10 times, and her rubbed her vagina with his penis at least 10 times. She remembered one time when she was 11, he tried to put his penis in her vagina. She told him it really hurt, and he stopped. Between the ages of 13 and 17, Gonzalez's sexual behavior occurred less often because Jane Doe 1 would tell her aunt about it. The most recent incident happened when Jane Doe 1 was 17. Jane Doe 1 and Jane Doe 3 had stayed up late to finish the younger girl's science project. Gonzalez, who had been drinking, signaled Jane Doe 3 to go with him, but Jane Doe 1 told her not to go and went in Jane Doe 3's place. Gonzalez started touching her inside of her bra and panties and made her touch his penis with her hand. He let Jane Doe 1 go when they heard her father coming downstairs.

The incidents Jane Doe 1 described were "just a very small portion" of the totality of what occurred over the years. After the final incident, while Jane Doe 1 was still 17, she heard Gonzalez and A.M. fighting downstairs. Gonzalez came to find Jane Doe 1 and told her that she had to stop "saying things" to her aunt and that "he was not going to go to jail for something as small as what he was doing, that he'd have to kill somebody for him to go to jail." Gonzalez threatened to get Jane Doe 1's father deported and kill her

6

mother, and "take [her] aunt down with him," if she said anything. Jane Doe 1 had seen Gonzalez be physically and verbally abusive with A.M. She disclosed what had been happening to an adviser at college, and, after starting therapy in the spring of her freshman year, she reported the abuse to child welfare.

Jane Doe 1 acknowledged during cross-examination that, several times, she had accused her boyfriend of six years of having raped her. Sometimes, when she was having sex with her boyfriend and didn't really want to, it would bring out the same kind of "scared feelings" she had when being molested. Afterward, she and her boyfriend would talk, and she would recognize that he had not really raped her. Nevertheless, she would sometimes falsely accuse her boyfriend of rape thereafter when they argued and she was angry, saying "[y]ou raped me." Sometimes, it was because she realized she hadn't really resolved the issue and wanted to fix the relationship. Other times, she just wanted to make him feel badly. She did not tell the police or anyone else that her boyfriend had raped her. It never felt the same as what Gonzalez had done to her.

## B.     *Jane Doe 2*

Jane Doe 2 was born in March 2000. She testified that Gonzalez touched her sexually between the ages of four and 14. He would touch her vagina and take her into a dark bathroom and make her perform oral sex on him. Jane Doe 2 recalled that the oral sex happened at the rat house, more than 10 times. Oral sex also happened at the East Meadow house, more than 10 times, when Gonzalez would call her into the bathroom. She also remembered that adults found out about the abuse when she lived in the East Meadow house. One time, when Gonzalez did not live with them, he took her upstairs at his house in Stockton, promising her candy. He put

7

white goggles on her with black tape on them, so she couldn't see, and put his penis in her mouth. It was a sunny day and A.M. was home with her two daughters. Jane Doe 1 was also there. Another time, when she was at least six, he took her to an empty room in another house and pulled down her pants and panties. She got really scared and she peed, which Gonzalez did not seem to like. He let her go.

Jane Doe 2 saw Gonzalez take Jane Doe 3 into the bathroom at the Hemleb house more than once. Gonzalez also took her into the bathroom and put his penis in her mouth more than 10 times in the Hemleb house. During her first year of middle school, Gonzalez had been teaching her self-defense because she was being bullied at school. One morning Gonzalez said he wanted to review some things. He laid down on top of her and rubbed his groin on her vagina while they were both clothed. Jane Doe 2 was mad at herself for not realizing what he was planning. She cried at school that day but did not tell anyone what was going on because, when her father and aunts found out about it at the East Meadow house, they "didn't really do anything." Another time, at the Hemleb house, there was a group playing tag and he caught her behind a door and rubbed her vagina over her clothes. The most recent time something happened was in the summer after she graduated from middle school. She was asleep on the couch when she woke up and heard a slapping noise and Gonzalez muttering. She realized Gonzalez was masturbating and pretended to still be asleep so he wouldn't do anything to her.

In the third grade, Jane Doe 2 told a friend, who was going through something similar, what Gonzalez was doing to her. She also told Jane Doe 1 a couple of times. In March 2017, she spoke to a police officer who came to her school about the abuse.

8

## C.   *Jane Doe 3*

Jane Doe 3 was born in January 2002.  She testified that she "never had a dad to grow up with," and Gonzalez was like a father to her.  Gonzalez touched her in a sexual way between the ages of three and 13.  He kissed her on her mouth, neck, and/or vagina at least once a week.  Occasionally, he would touch her inside and outside of her vagina with his hand.  She touched his penis "[a] lot"—more than 20 times.  He also put his penis in her mouth more than 20 times in the bathrooms at the Hemleb house.  It would happen every week.  She recalled one instance at the Hemleb house when he rubbed her vagina with his penis while she was sitting on top of him.  He tried to put his penis inside her.  Another time he took her clothes off and touched her vagina with his mouth on the living room couch.  She felt scared.

When she was younger and lived in her previous house, Gonzalez would lure her into the bathroom with promises of things like cookies and put his hand and mouth on her private area.  Gonzalez would ejaculate.  He would tell her not to tell anybody.  She thought the behavior was normal, not knowing it was "a bad thing."  Jane Doe 3 remembered a specific incident while she was living at her first house when she and one of Gonzalez's daughters were playing with Barbies at his house and he called her upstairs, saying he needed to talk to her.  He was unclothed, told her to close her eyes, and made her put her mouth on his penis.

Jane Doe 3 told Jane Doe 1 what was happening with Gonzalez when she was around 12 years old.  They decided to tell A.M. about the abuse.  When Jane Doe 3 was in eighth grade, she was working on a science project with Jane Doe 1 when Gonzalez came home.  She saw him go into the downstairs living room with Jane Doe 1.  She was worried he was "doing things" to Jane Doe 1.  She had never actually seen him do anything to Jane

9

Doe 1 or Jane Doe 2 in either house, but she noticed he would take each of them away from the group, so she had "an idea." Ultimately, she talked to a police officer about the abuse while she was at school.

### D.    Jane Doe 4

Jane Doe 4 was born in March 1979 and is Gonzalez's daughter. She did not live with Gonzalez, and their relationship was "off and on" as her parents were not together. When asked if Gonzalez had ever touched her inappropriately, Jane Doe 4 initially testified that she "was not sure." However, she acknowledged she had voluntarily made a statement to the police in April 2017. In that statement, she disclosed that—when she was between five and eight years old—Gonzalez had touched her over her clothing in her vaginal area and on her chest five or six times. Jane Doe 4 never told anyone about Gonzalez's inappropriate behavior.

On New Year's Eve in 2007, various family members were hanging out together when Jane Doe 4 observed Gonzalez lean down and whisper something in Jane Doe 1's ear. "[R]ed flags went off" in Jane Doe 4's mind, so, after a while, she went to see where Jane Doe 1 had gone. Jane Doe 4 knocked on the bathroom door and, after Gonzalez exited, she discovered Jane Doe 1 standing in the shower behind the shower curtain. According to Jane Doe 1, Gonzalez told her to stay there because they were going to play hide-and-go-seek. Jane Doe 4 told A.M. what she had observed and asked her to speak with Jane Doe 1 to "make sure everything [was] good." A.M. subsequently took Jane Doe 1 into a closed bedroom. Jane Doe 4 also called Jane Doe 1's father and suggested he talk to her to make sure she was okay. She could not recall whether she had told Jane Doe 1's father that she had been molested by Gonzalez in the past.

On cross-examination, Jane Doe 4 testified that she had been seeing a therapist for about a year because "a lot of things" from her past were coming to the surface. This process made her less confident that the described abuse actually happened. Jane Doe 4 spent time with the other three Jane Does over the years and none of them acted afraid of Gonzalez. She had never observed anything similar to what happened in 2007 on New Year's Eve. If she had suspected that Gonzalez was molesting the other Jane Does, Jane Doe 4 would not have hesitated to call the police. After Gonzalez was arrested, Jane Doe 4 told Jane Doe 1 that something had happened to her when she was younger but gave no specifics. Jane Doe 1 told Jane Doe 4 "she was going to do whatever she could do to see [Gonzalez] go away for a long time."

Jane Doe 4 did not want to testify at trial for a number of reasons, including the fact that she worked in a prison and feared for her safety if inmates heard she had testified in a criminal case. However, when she was in court the previous day, the judge ordered her to testify. After consulting with her union, she agreed to testify because she feared she would lose her job if she disobeyed the court's order.

## E. *Testimony of A.M.*

Even before she lived with them at the Hemleb house, A.M. spent a significant amount of time with Jane Does 1, 2, and 3 as their caretaker. A.M. acknowledged previously telling Detective Bloom that, on New Year's Eve 2007, Jane Doe 1 told her Gonzalez had pulled her into the bathroom and started touching her. A.M. later asked Gonzalez what had happened, and Gonzalez told her they were going to play hide-and-seek. A.M. told Detective Bloom that Gonzalez was yelling and stated: " 'Everyone is lying and if anyone says anything, someone is going to get hurt.' " She had also reported

11

to the detective that Gonzalez threatened to take their daughter and run away so A.M. would never see her again.  A.M. did not make a report to the police.  A.M. told Detective Bloom that one of the reasons they moved out of the Hemleb house for about a year in 2009 was that Jane Doe 1 told her Gonzalez was touching Jane Doe 2.  A.M. did not go to the police.

In 2015, after A.M. and Gonzalez had returned to the Hemleb house, Jane Doe 1 told A.M. that Gonzalez was touching her again.  A.M. asked Gonzalez about it, and he said it wasn't true.  A.M. thought about moving out of the state at that time but took no steps to do so.  A.M. told Detective Bloom that Gonzalez found a bag he had packed and threatened to take away her children if she reported the abuse.  A.M. also told Detective Bloom that she never went to the police because she was frightened of Gonzalez.

When she met with Detective Bloom, A.M. was focused on getting her children back and believed she needed to tell him certain things and look cooperative.  She was not really afraid of Gonzalez.  Nor did she remember Jane Doe 1 telling her on New Year's Eve in 2007 that Gonzalez had touched her.  Jane Doe 1 had reminded her of this fact prior to her interview.  Jane Doe 1 telling her that their statements needed to line up had an effect on how A.M. explained things to the police.  She never saw anything suspicious and, had she learned that something sexual was happening with the girls, she would not have hesitated to call the police.

## F.  *Police Testimony*

Police Officer Patrick Rude testified that he spoke with Jane Does 2 and 3 at school in March 2017 in response to a report of possible sexual abuse.  After discussing the situation with the girls, who were both crying, he asked child welfare to take all of the children at the Hemleb house into protective custody.  When Officer Rude pulled up to the house with the girls,

he saw Gonzalez arrive in a minivan and enter the house. Officer Rude asked Jane Doe 1's father to go inside the house to protect any children that were present. About 10 minutes later, Jane Doe 1's father came back outside, stating that Gonzalez had left out the back of the house with his two children. Officer Les Lopez testified that he subsequently located Gonzalez and his children walking hurriedly about a half mile away. He detained Gonzalez at that time.

Detective Bloom interviewed Jane Doe 1 during the course of his investigation of Gonzalez. She was emotional, "talking to me about something that was clearly a very sensitive issue for her and her family, and she was semi-reluctant to want to talk about it." Detective Bloom also interviewed Jane Doe 4 in March 2017. She was calm, appeared very cooperative, answered all of his questions without hesitation, and told him she had been molested by Gonzalez. Portions of her interview were played for the jury. Detective Bloom interviewed A.M. in April 2017. His testimony confirmed that A.M. had told him all the things she acknowledged reporting during her testimony.

## G. *Verdict and Sentencing*

The case went to the jury with final instructions on March 26, 2019. On March 28, 2019, the jury returned guilty verdicts with respect to all 47 counts of felony child abuse. It also found the multiple victim enhancement true with respect to all but three counts for which it was alleged (counts 5, 6, and 19). On August 16, 2019, the trial court denied Gonzalez's motion for a new trial, rejecting three of the four claims he now raises on appeal.

The trial court then moved on to sentencing. It denied probation and imposed a determinate sentence of 18 years, 8 months—the midterm of six years on each of counts 5, 6, and 19, and eight months (one third the midterm

of two years) for count 34, all to run consecutively. The court additionally imposed a consecutive indeterminate sentence of 695 years to life—sentences of 25 years to life on counts 33, 42, and 45 through 47; and 15 years to life for counts 1 through 4, 7 through 18, 20 through 32, 35 through 41, 43, and 44. The court rejected Gonzalez's constitutional claim that the length of the sentence constituted cruel and unusual punishment. This timely appeal followed.

## II. DISCUSSION

### A. *No Coercion in Compelling the Testimony of Jane Doe 4*

Gonzalez first argues that the trial court unlawfully coerced Jane Doe 4 to testify in this case, violating his constitutional right to a fair trial. According to Gonzalez, the trial court erred because it improperly advised Jane Doe 4 that it would prosecute her for criminal contempt pursuant to subdivision (a)(6) of section 166 if she refused to testify. Among other arguments, Gonzalez notes that such misdemeanor contempt actions can only be brought by the prosecution and, absent a waiver, require a formal process and jury trial, which were not contemplated in the court's setting of a contempt hearing for the next day. While the trial court was not entirely clear regarding the application of relevant contempt statutes in his discussions with Jane Doe 4, Gonzalez has failed to meet his burden of proof with respect to this constitutional claim.

### 1. *Additional Background*

As detailed above, Gonzalez's adult daughter, Jane Doe 4, testified at trial in this matter. The day before her testimony, the trial court held a hearing under Evidence Code section 402 to determine whether she would agree to answers questions in the case. Jane Doe 4 was represented by her own attorney at the hearing. After being sworn as a witness, she refused to

14

provide her date of birth in response to the prosecutor's question. At the prosecutor's request, the court ordered Jane Doe 4 to answer the lawyers' questions, stating that, unless she had a valid assertion of privilege, she was "required and ordered to answer the questions asked."

Jane Doe 4 still refused to answer and declined to explain why she would not comply. Noting that Jane Doe 4 had been subpoenaed as a witness in the case, the court advised her as follows: "You, as every citizen or every person in this country, are required by law to testify unless you have a valid privilege that excuses you from testifying. You have an obligation to testify whether you want to or not. [¶] This is not an option on your part. It is an order from the Court. It is required by law, and it is a crime to refuse to testify. I'm ordering that you answer the questions asked. [¶] If you need to consult with your attorney, I'm happy to give you an opportunity to do that. But if you refuse to answer questions without a valid privilege you are committing a crime. The crime is contempt of court. And I will be proceeding down the path of enforcing a contempt of court through civil or criminal sanctions, if necessary. [¶] I have no interest in doing that. My interest is in requiring that you, like everyone else in this country, answer questions when ordered to do so, whether you want to or not. It is simply not an option on your part."

Jane Doe 4 indicated that she understood, but still refused to testify. The court again admonished her: "[Jane Doe 4], you are ordered to testify. You do not have the option to refuse. If you continue to refuse to testify, I will cite you for contempt and schedule a criminal contempt trial for you. [¶] If you are found to have committed contempt, then you will have suffered a misdemeanor conviction for contempt in violation of Penal Code Section 166(a)(6). [¶] I will tell [you that] there are criminal sanctions that come

15

along with this. They include probation, fines, community service. You can be ordered to take classes. [¶] You cannot be incarcerated for refusal to testify under the law,[2] but it remains a crime, and it remains a fact that you do not have the option to refuse. So you are violating a court order if you refuse to testify."

After she again refused to answer basic questions, the prosecutor asked that Jane Doe 4 be held in contempt. The court ordered her to testify a third time and told her that, if she declined to do so, it would "cite [her] for contempt and hold a criminal contempt trial." She still refused. The court asked her attorney whether he had anything to add before it cited Jane Doe 4 for contempt, and counsel acknowledged that Code of Civil Procedure section 1219 did not create a privilege but only limited the sanctions available to the trial court. The court agreed, elaborating: "[Code of Civil Procedure Section] 1219 is a limitation on punishment. It is not a legal excuse for committing a crime. One can rob a bank, despite the punishment, it is still a crime."

The prosecutor then explained that, in addition to questions regarding Jane Doe 4's own reported sexual abuse by Gonzalez, she also intended to elicit testimony about the New Year's Eve incident involving Jane Doe 1 that Jane Doe 4 witnessed. The prosecutor argued that such testimony was unrelated to Jane Doe 4's status as a potential victim of sexual assault and thus her refusal to answer questions in that context would fall outside the ambit of Code of Civil Procedure section 1219, subdivision (b). The trial court found this argument "[i]nteresting" and stated it would give some thought to whether it would affect the sanctions it could impose on Jane Doe 4 "if she is

---

[2] As we discuss further below, victims of sexual assault and/or domestic violence cannot be incarcerated "for contempt if the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime." (Code Civ. Pro., § 1219, subd. (b).)

convicted of criminal contempt." It allowed the prosecutor to question Jane Doe 4 specifically regarding New Year's Eve 2007, but she still refused to answer. The court concluded: "So, [Jane Doe 4], in light of your repeated refusal, despite many warnings and without any excuse or justification whatsoever, to comply with the court order, I am citing you with criminal contempt. [¶] I will hold a contempt trial tomorrow morning."

The next day, there was no discussion of a contempt trial. Instead, the district attorney made a proffer regarding Jane Doe 4's anticipated testimony, stating that Jane Doe 4 had entered therapy after she gave a statement to detectives in 2017. Apparently, she was now having doubts regarding whether the sexual abuse actually occurred. After argument, the court overruled renewed objections to Jane Doe 4's testimony based upon Evidence Code sections 1101, subdivision (b), 1108 and 352, and she testified as previously summarized.

After the jury returned its guilty verdicts in the case, Gonzalez moved for a new trial, arguing, among other things, that Jane Doe 4's testimony had been coerced in violation of his constitutional rights for the same reasons set forth in his briefing before this court. In rejecting the argument, the trial court opined that a victim of sexual assault could still be prosecuted for misdemeanor criminal contempt under section 166, subdivision (a), because Code of Civil Procedure section 1219 only limits available sanctions. It does not make "criminal contempt non-criminal by virtue of the change in penalties." The court also noted that the plain language of Code of Civil Procedure section 1219, subdivision (b) applies only to testimony concerning the witness's own sexual assault. Since Jane Doe 4 initially declined to testify about anything—including her date of birth and her percipient

17

observations on New Year's Eve in 2007— she could have been incarcerated for her refusal to testify regarding issues unrelated to her own victimization.

The trial court admitted that it misspoke when it cited section 166. It meant to refer to direct contempt pursuant to Code of Civil Procedure section 1218, which can be "summarily found . . . by the Court without a jury and without all the panoply of rights in a criminal jury trial. " The court emphasized that Jane Doe 4 was represented by counsel throughout the proceedings and that it put the matter over to the next day, "in an abundance of caution," so that she could further consult with counsel and possibly change her mind and agree to testify.

The court then concluded that any error on its part in its description of applicable code sections or potential penalties did not amount to "unlawful coercion" of Jane Doe 4 within the meaning of the due process clause. Jane Doe 4 had a lawful duty to testify and no legal right to decline under any theory. Noting that the point of the contempt statutes is to encourage people to testify, the court reasoned: "[I]f the theory were that anyone who is compelled under threat of contempt sanctions to testify and then who decides to testify as required by law in order to avoid the contempt sanctions, if that resulted in involuntary testimony, then . . . everybody who testified in order to avoid contempt would be automatically involuntary and inadmissible [which] would simply be an absurd proposition." Moreover, Jane Doe 4 stated that she decided to testify as ordered because she had talked to her union representative, and she "was afraid she would lose her job if she disobeyed the Court's order." The trial court posited her decision would have been the same whether or not it had cited the correct code section.

## 2. *Legal Framework*

Pursuant to Code of Civil Procedure section 1209, both "[d]isobedience of any lawful judgment, order, or process of the court" and "[d]isobedience of a subpoena duly served, or refusing to be sworn or answer as a witness" constitute contempt of court. (Code Civ. Pro., § 1209, subd. (a)(5) & (10).) "When a contempt is committed in the immediate view and presence of the court . . . , it may be punished summarily." (*Id.*, § 1211, subd. (a) & subd. (e).) The usual penalties for contempt of court are a fine of up to $1000 and/or imprisonment for up to five days. (*Id.*, § 1218, subd. (a).) However, "if the contempt consists of the omission to perform an act which is yet in the power of the person to perform, he or she may be imprisoned until he or she has performed it." (*Id.*, § 1219, subd. (a).) In contrast, a trial court cannot jail a sexual assault or domestic violence victim for contempt "if the contempt consists of refusing to testify concerning that sexual assault or domestic violence crime." (*Id.*, § 1219, subd. (b).) A contempt proceeding under these provisions "is not a criminal action or proceeding. It is a special proceeding, criminal in character, governed by the provisions of the Code of Civil Procedure, not by those of the Penal Code; not for the punishment of an offense against the state, but intended to implement the inherent power of the court to conduct the business of the court and enforce the lawful orders of the court." (*Oil Workers International Union v. Superior Court* (1951) 103 Cal.App.2d 512, 570; accord, *Pacific Tel. & Tel. Co. v. Superior Court* (1968) 265 Cal.App.2d 370, 371–372.)

Contempt of court may also be processed criminally under section 166. Pursuant to that statute, "[t]he contumacious and unlawful refusal of a person to be sworn as a witness or, when so sworn, the like refusal to answer a material question" constitutes contempt of court and is a misdemeanor.

19

(§ 166, subd. (a)(6).) It is punishable by imprisonment in the county jail for up to six months and/or by a fine of up to $1000. (§ 19; see also *In re Keller* (1975) 49 Cal.App.3d 663, 669-670.)

Here, Gonzalez claims that the trial court's improper coercion of Jane Doe 4's trial testimony through unlawful threats of contempt violated his constitutional rights to due process and a fair trial. We review such constitutional claims de novo. (*People v. Morales* (2021) 67 Cal.App.5th 326, 345.) In this context, however, "it is important to recall that defendants must allege a violation of their *own* rights in order to have standing to argue that testimony of a third party should be excluded because it is coerced." (*People v. Badgett* (1995) 10 Cal.4th 330, 343 (*Badgett*); accord *People v. Douglas* (1990) 50 Cal.3d 468, 501 (*Douglas*) [if the defendant seeks to exclude a third party's testimony on the ground the testimony is somehow coerced or involuntary, "[a]ny basis for excluding [the third party's] testimony must be found in a federal constitutional right personal to defendant"], disapproved on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, fn. 4.) Thus, Gonzalez is limited "to assert[ing] that his own due process right to a fair trial was violated as a consequence of the asserted violation of [Jane Doe 4's rights]." (See *People v. Jenkins* (2000) 22 Cal.4th 900, 966 (*Jenkins*).) As our high court has recognized, "the ' "admission at trial of improperly obtained statements [of a third party] which results in a fundamentally unfair trial violates a defendant's Fifth Amendment right to a fair trial." ' " (*Ibid.*, quoting *Douglas*, at p. 499.)

Critically, however, "pretrial coercion of a third party's statement presents no basis of relief to the defendant ' "*if there was nothing improper about the trial itself.*" ' " (*Badgett, supra,* 10 Cal.4th at p. 344, quoting *Douglas*, at p. 502.) Rather, violation of a third party's rights may deprive a

defendant of due process only if such violation "adversely affects the reliability of testimony offered against the defendant at trial." (*Jenkins, supra*, 22 Cal.4th at p. 966; accord *Badgett*, at p. 344 ["the basis of the claim must be that coercion has affected the third party's trial testimony"]; see also *People v. Williams* (2010) 49 Cal.4th 405, 452-455.) As an example, our Supreme Court has cited a case in which "the court held that a witness's trial testimony was so untrustworthy as to violate the defendant's right to a fair trial because the incarcerated witness was subject to *continuing* torture and beatings that could be resumed after trial if the witness failed to testify against [the] defendant as planned." (*Badgett*, at p. 344.) In sum, "[w]hen a defendant seeks to exclude evidence on this ground, the defendant must allege that the trial testimony is coerced [citation], and that its admission will deprive him [or her] of a fair trial [citation]." (*Jenkins*, at p. 966.)

### 3.    *No Unlawful Coercion in this Case*

The majority of Gonzalez's coercion arguments fail because they stem from his claims that a sexual assault victim cannot be criminally prosecuted under section 166 for refusing to testify and that the trial court erred by threatening Jane Doe 4 with criminal contempt, both of which assumptions are erroneous. Gonzalez argues that a sexual assault victim under Code of Civil Procedure section 1219, subdivision (b), cannot be convicted of criminal contempt because a misdemeanor conviction "by definition is punishable by some jail time" and victims of sexual assault cannot be incarcerated for refusing to testify. This claim is belied by the statutory language, which allows a court to punish criminal contempt by jail time *or* a fine.[3]

---

[3] Gonzalez's citations to delinquency cases involving juvenile court wards are inapplicable in this criminal prosecution.

21

Moreover, reference to criminal contempt in the context of summary contempt proceedings under the Code of Civil Procedure is not necessarily error where, as here, the " 'primary object' " of any such contempt proceedings would have been to " 'vindicate the dignity or authority of the court.' "  (See *In re Nolan W.* (2009) 45 Cal.4th 1217, 1236 [" 'Where the primary object of contempt proceedings is to protect the rights of litigants, the proceedings are regarded as civil in character.  On the other hand, where the object of the proceedings is to vindicate the dignity or authority of the court, they are regarded as criminal in character even though they arise from, or are ancillary to, a civil action,' " quoting *Morelli v. Superior Court* (1969) 1 Cal.3d 328, 333.].)  Finally, although the trial court, itself, could not institute a prosecution for criminal contempt under section 166, it did not err by informing Jane Doe 4 that such a prosecution could be a consequence of her refusal to testify.  Indeed, under similar facts the California Supreme Court has deemed "reasonable" a trial court's efforts to induce a sexual assault victim to testify by threatening a prosecution for criminal contempt, even though the court had no power to incarcerate the victim for refusing to testify regarding her sexual assault.  (See *People v. Smith* (2003) 30 Cal.4th 581, 624 (*Smith*).)  Similarly, here, the court merely threatened Jane Doe 4 with the possibility of criminal contempt; it never improperly instituted such proceedings.[4]

---

[4] We note that the trial court expressly informed Jane Doe 4 that she was *not* subject to incarceration for refusing to testify.  However, when it denied Gonzalez's new trial motion, the trial court opined that Code of Civil Procedure section 1219, subdivision (b) applies only to testimony regarding a witness's own victimization and that it could have incarcerated her for refusing to testify on other topics, such as her percipient observations on New Year's Eve in 2007.  We express no opinion on this point.

Although it is true that the court appeared to state, at times, that *it* would commence criminal contempt proceedings against Jane Doe 4, the error had little practical effect. The court could summarily find Jane Doe 4 in contempt and fine her up to $1000 under the civil contempt statutes. And it could also request that parallel criminal proceedings be instituted, which would allow, eventually, for a similar fine. The court continued the matter overnight to give Jane Doe 4 time to further consider her options and, had she still refused to testify, it could have held her in civil contempt and fined her without notice or a jury that next day. Thus, to the extent the court misspoke, we do not find the error particularly coercive, especially since Jane Doe 4 was represented by independent counsel throughout the proceedings. In the end, as the court recognized, it was Jane Doe 4's fear that she would lose her job for violating a *court order* that convinced her to testify, not anything specific to the possibility of a criminal prosecution.[5]

But even were we to conclude that Jane Doe 4 was somehow improperly coerced into testifying (which we do not), we would find no constitutional violation on this record because Gonzalez has made no showing that Jane Doe 4's testimony made his trial fundamentally unfair. This is not a case where a witness was coerced into testifying in a particular way or urged to be untruthful. Moreover, Jane Doe 4's trial testimony, in which she claimed to be unclear about whether the abuse actually occurred, was helpful to Gonzalez because it opened up the possibility that the jury would discount her prior statement to the police. Although Gonzalez no doubt would have preferred that Jane Doe 4 not testify at all and that no evidence of her sexual

---

[5] Because we find no unlawful coercion, we decline to consider Gonzalez's additional argument that the prosecutor committed misconduct by knowingly allowing the trial court to unlawfully coerce Jane Doe 4's testimony.

abuse allegations be admitted at trial, this desire does not implicate his constitutional fair trial rights. That testimony is damaging to the defense does not make it unconstitutional. In short, since Gonzalez has made no showing that Jane Doe 4's trial testimony was unreliable in a way which compromised his right to a fair trial, his constitutional complaint necessarily fails.

## B. *Admission of Uncharged Sexual Abuse of Jane Doe 4*

In a related argument, Gonzalez contends the trial court's admission of the evidence regarding his uncharged sexual molestation of Jane Doe 4 under Evidence Code section 1108 was erroneous. Specifically, he asserts that the alleged sexual offenses occurred in the 1980's and the statutes of limitation had expired, rendering the acts no longer criminal and therefore inadmissible under Evidence Code section 1108. We are not convinced.

### 1. *Legal Framework*

Pursuant to Evidence Code section 1108, subdivision (a), "[i]n a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] Section 1101, if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." Evidence Code section 1108 thus provides an exception to the general rule that "[c]haracter evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159 (*Villatoro*).) As the statutory language makes clear, however, trial judges "must engage in a careful weighing process under [Evidence Code] section 352" before admitting other incidents involving sexual abuse under

Evidence Code section 1108.  (*People v. Falsetta* (1999) 21 Cal.4th 903, 917 (*Falsetta*).)

"Sexual offense" is defined for purposes of Evidence Code section 1108 to mean "a crime" under state or federal law that involved certain proscribed "conduct," including conduct proscribed by certain sections of the Penal Code such as section 288.[6]  (Evid. Code, § 1108, subd. (d)(1).)  A trial court's decision to admit evidence of such uncharged sexual offenses is generally reviewable for abuse of discretion.  (*People v. Wesson* (2006) 138 Cal.App.4th 959, 969.)  However, questions of statutory interpretation, such as Gonzalez asserts here, are subject to our de novo review.  (*People v. Tirado* (2022) 12 Cal.5th 688, 694.)

As we recently reiterated:  " ' "The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." '  [Citations.]  'Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context.'  [Citation.]  'The statute's plain meaning controls the court's interpretation unless its words are ambiguous.'  [Citation.]"  (*Pacific Fertility Cases* (2022) 78 Cal.App.5th 568, 575–576 (*Pacific Fertility*).)

"When ' " 'the language permits more than one reasonable interpretation, . . . the court looks "to a variety of extrinsic aids, including the

---

[6] Section 288 criminalizes the commission by a person of "any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."  (§ 288, subd. (a).)  The jury in this case was instructed that the abuse described by Jane Doe 4 could be considered as propensity evidence if it found the conduct fell within this provision.

25

ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' " ' [Citation.]" (*Pacific Fertility*, *supra*, 78 Cal.App.5th at p. 576.) Fundamentally, however, " ' "statutes must be construed so as to give a reasonable and common-sense construction consistent with the apparent purpose and intention of the lawmakers—a construction that is practical rather than technical, and will lead to wise policy rather than mischief or absurdity." ' [Citation.]" (*Ibid.*) "Ultimately, ' "[i]f a statute is amenable to two alternative interpretations, the one that leads to the *more* reasonable result will be followed." ' [Citation.]" (*Ibid.*)

### 2.    *Additional Background*

Prior to trial, the prosecution moved to admit evidence of Gonzalez's sexual abuse of Jane Doe 4 between 1984 and 1987 under Evidence Code section 1108. After argument, the trial court found the evidence to be "powerful and probative evidence of propensity." It went on to balance its probative value against any prejudicial effect under Evidence Code section 352, specifically considering the issue of remoteness in time, and concluded that the balance weighed in favor of admission of the evidence.

As stated above, the parties renewed their arguments regarding the admissibility of Jane Doe 4's testimony, when, immediately before she testified, she told the prosecutor that she had entered therapy in 2018 (after giving her statement to police in 2017) and was having doubts about whether she was actually molested by Gonzalez. The trial court reconsidered the matter and reaffirmed its prior ruling that the probative value of Jane Doe 4's testimony strongly outweighed any undue prejudicial effect. It noted that victims of sexual abuse often recant and stated: "[T]he fact that she is

recanting now does not strongly suggest to me that her earlier statements were untrue, particularly . . . in light of her absolute refusal in the face of multiple court orders to testify yesterday." The court further opined that the jury was "well-equipped" to evaluate the truth of her various statements and that both sides could fully explore her credibility.

In his new trial motion, Gonzalez raised for the first time the argument he now presses on appeal. The Supreme Court held in *Stogner v. California* (2003) 539 U.S. 607, 609 (*Stogner*), that a 1993 California law—which permitted the prosecution of certain child sexual abuse crimes for which the statute of limitations had already expired—was unconstitutional under ex post facto principles to the extent it was applied to criminal prosecutions for which the limitations period had expired prior to enactment of the law. According to Gonzalez, *Stogner* holds that expiration of the statutes of limitation for these older offenses rendered them "non-existent and no longer a crime." Since Evidence Code section 1108 refers to the sexual offenses it covers as "crimes" and any statute of limitations as to Gonzalez's alleged offenses against Jane Doe 4 had expired, Gonzalez reasons that the time-barred prior conduct could not be admitted to prove propensity under Evidence Code section 1108.

The trial court rejected Gonzalez's *Stogner* argument. It noted that the Legislature had included some time limits for the admissibility of other crimes evidence under Evidence Code sections 1108 and 1109, so it knew how to do so. Yet the Legislature "did not tie the admissibility of prior offenses to the statute of limitations, and simply as a matter of logic the running of the statute of limitations does not make the criminal conduct non-criminal. [It] simply precludes prosecution." Thus, as applied to this case, Gonzalez's alleged conduct "was an offense, [Jane Doe 4] was a victim of sexual assault

27

based on her statements, and it is still a crime.  It's just a crime that can no longer be prosecuted.  So I don't agree with the argument."

### 3.    *No Error in Admission of Section 1108 Evidence*

We agree with the trial court that the running of any applicable statute of limitations does not foreclose the admissibility of uncharged sexual offenses under Evidence Code section 1108.  As the California Supreme Court has opined in this context:  "By its terms, the statute does not distinguish between charged and uncharged sexual offenses, and refers instead to '*another* sexual offense or offenses.' "  (*Villatoro*, *supra*, 54 Cal.4th at p. 1160.) "This definition of 'another' contains no limitation, temporal or otherwise." (*Id.* at pp. 1156, 1161 [finding Evidence Code section 1108 applicable to charged as well as uncharged offenses].)  Importing a timing requirement based on the applicable statute of limitations into Evidence Code section 1108's definition of "another sexual offense," as Gonzalez suggests, is not only seemingly inconsistent with the statute's plain language but is also contrary to the underlying purposes of the statute; misapprehends the nature and operational effect of statutes of limitation; and is an illogical, and therefore unreasonable, interpretation.

As the California Supreme Court has explained:  "[T]he Legislature enacted section 1108 to expand the admissibility of disposition or propensity evidence in sex offense cases." (*Falsetta*, *supra*, 21 Cal.4th at p. 911.)  In particular, "[a]vailable legislative history indicates [Evidence Code] section 1108 was intended in sex offense cases to relax the evidentiary restraints [Evidence Code] section 1101, subdivision (a), imposed, to assure that the trier of fact would be made aware of the defendant's other sex offenses in evaluating the victim's and the defendant's credibility." (*Ibid.*)

28

This is because "[t]he propensity to commit sexual offenses is not a common attribute among the general public. Therefore, evidence that a particular defendant has such a propensity is especially probative and should be considered by the trier of fact when determining the credibility of a victim's testimony." (*Villatoro, supra*, 54 Cal.4th at p. 1164.)

Moreover, " '[t]he Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' " (*Falsetta, supra*, 21 Cal.4th at p. 911.) Thus, "the Legislature's principal justification for adopting [Evidence Code] section 1108 was a practical one: By their very nature, sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations." (*Id.* at p. 915.) Under such circumstances, "the policy considerations favoring the exclusion of evidence of uncharged sexual offenses are outweighed in criminal sexual offense cases by the policy considerations favoring the admission of such evidence." (*Id.* at p. 911.) As we discuss further below, Gonzalez's restrictive interpretation of the prior sexual conduct admissible under Evidence Code section1108 is plainly inconsistent with the Legislature's intent to expand the admissibility of such disposition evidence in sex cases.

Gonzalez's argument is also based on a flawed understanding of statutes of limitation. In Gonzalez's view, once a limitations period has expired, proscribed sexual acts are somehow transmuted into non-criminal conduct and therefore cannot be considered "sexual offenses" within the meaning of Evidence Code section 1108. However, statutes of limitations are intended only to limit a perpetrator's exposure to *criminal prosecution* for a

fixed period of time and thereby provide a form of amnesty from prosecution after the period has expired. (See *Stogner*, *supra*, 539 U.S. at p. 632; *Roman Catholic Bishop of Oakland v. Superior Court* (2005) 128 Cal.App.4th 1155, 1161, citing *Stogner*; *In re Gustavo M.* (1989) 214 Cal.App.3d 1485, 1494.) As our high court has explained: "[S]tatutes of limitation are an optional form of 'legislative grace,' reflecting a pragmatic determination that the interests of the state are best served by forgoing prosecution in some cases. . . . [T]he statute of limitations is often said to work in an 'arbitrary' or 'mechanical' fashion to insulate from prosecution even those individuals whose conduct otherwise satisfied all elements of a penal statute, and who were otherwise subject to criminal punishment, at the time the conduct occurred." (*People v. Frazer* (1999) 21 Cal.4th 737, 758, fns. omitted, reversed on other grounds in *Stogner*, *supra*, 539 U.S. at p. 633.)

In contrast, Evidence Code section 1108 governs the admissibility of evidence of certain *prior conduct* at trial. It is not a penal statute and does not proscribe conduct for which a defendant can be prosecuted and punished. (Cf. *People v. Story* (2009) 45 Cal.4th 1282, 1290–1291 [prior acts of sexual abuse admissible under Evidence Code section 1108 in prosecution for first degree felony murder based on entry with the intent to rape; charged murder was a "sexual offense" because it involved conduct proscribed by the rape statute, even though rape had not been separately charged because the statute of limitations had run].) Thus, although a jury must determine whether the defendant committed prior acts in order to consider them evidence of criminal propensity, the defendant is not being prosecuted for those acts; nor is he or her subject to punishment for them. Indeed, the jury is expressly instructed that such evidence by itself is not enough to convict the defendant of charged offenses. (CALCRIM No. 1191.)

30

In short, neither the purpose nor the effect of statutes of limitations suggests that, when a period of limitations expires, prior unlawful acts somehow morph into non-criminal or innocent conduct. Rather, as the trial court in this case recognized, expiration of the limitations period means only that the perpetrator cannot be prosecuted and punished for that particular conduct. Gonzalez cites no authority for the proposition that statutes of limitation have any effect on the relevance or admissibility of evidence.[7] In contrast, at least one court has concluded that the admissibility of uncharged conduct under Evidence Code sections 1101 and 1108 is *not* restricted by any applicable statute of limitations. (See *Roman Catholic Archbishop of Los Angeles v. Superior Court* (2005) 131 Cal.App.4th 417, 458 ["[A]dmissible 'other crimes' evidence is not restricted by the statute of limitations. . . . '[N]either Evidence Code section 1101(b) nor 1108 is a chargeable offense. They are merely rules of admissibility for evidence at trial.' "].)

This conclusion makes sense, as Gonzalez's proposed reading of Evidence Code section 1108 would lead to anomalous and illogical results. For example, under Gonzalez's suggested approach, evidence of prior unlawful sexual conduct would be admissible if the defendant was prosecuted and convicted of it or was still subject to prosecution for it. However, evidence of identical (and presumably equally probative) sexual misconduct would be inadmissible if the applicable limitations period had expired

---

[7] And, in fact, courts have allowed the admission of prior uncharged and unprosecuted sexual conduct under Evidence Code section 1108 that occurred decades before the charged offense. (See, e.g., *People v. Waples* (2000) 79 Cal.App.4th 1389, 1392-1395 [previously unreported sexual conduct from 18 to 25 years before the charged crimes not too remote]; *People v. Soto* (1998) 64 Cal.App.4th 966, 977-978, 991-992 [uncharged sexual conduct that was never prosecuted and occurred 20 to 30 years before the charged offenses properly admitted; testimony "exactly the type of evidence contemplated by the enactment of [Evidence Code] Section 1108"].)

because the misconduct would no longer be a "crime." Thus, for example, evidence regarding a 20-year-old rape conviction could be presented as could evidence regarding an uncharged rape that occurred the year before the charged rape was prosecuted. But, if prosecution of the charged rape took place at the end of its applicable limitation period, a rape which occurred shortly before the charged rape but just outside its own limitation period could not be introduced pursuant to Evidence Code section 1108.

There is, obviously, no rational basis for such a distinction. Nor is it consistent with the Legislature's conclusion that the use of other sexual offense evidence should be expanded in this context because it is highly relevant with respect to a defendant's propensity to commit sexual offenses, the defendant's credibility, and the credibility of any victims. The fact that a defendant is no longer subject to prosecution for a prior sexual offense simply has no bearing on the relevance or probative value of that prior misconduct in a subsequent prosecution for a charged sexual offense. For all of these reasons, we reject Gonzalez's proposed construction of Evidence Code section 1108 and conclude that the term "sexual offense" in the statute was intended to apply broadly to *any* proscribed sexual conduct committed by a defendant, regardless of whether the statute of limitations for that conduct has expired.[8]

## C.    *No Prosecutorial Error*

---

[8] Because we have rejected both Gonzalez's constitutional claim based on third-party coercion as well as his proposed construction of Evidence Code section 1108, we also reject his concomitant assertions that his trial counsel was ineffective for failing to object to the admission of Jane Doe 4's testimony on these bases. (*People v. Bradley* (2012) 208 Cal.App.4th 64, 90 (*Bradley*) [failure to make a meritless objection is not ineffective assistance].) By separate order, we have also denied Gonzalez's related petition for habeas corpus (A163644), which raises the same claims.

Gonzalez next claims that the prosecutor in this case committed multiple instances of prejudicial misconduct during her closing arguments, thereby impermissibly lowering the prosecution's burden of proof. Relying largely on *People v. Centeno* (2014) 60 Cal.4th 659 (*Centeno*), Gonzalez asserts the prosecutor erred by suggesting that she had met her burden of proving the charges beyond a reasonable doubt if her theory of the case was merely "reasonable." Gonzalez further contends that defense counsel was ineffective for failing to object to the prosecutor's comments on this basis. We find neither prejudicial misconduct nor ineffective assistance of counsel.

### 1. *Additional Background*

In line with section 1096 and CALCRIM No. 220, the trial court instructed the jury in this case that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." In her closing argument, the prosecutor initially described her burden of proof as follows: "As you know, it's my burden to prove this case to you beyond a reasonable doubt. It's the highest burden in the criminal justice system. Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction of the charge. So what does that mean? [¶] I find it easier to break it down. Abiding means lasting; conviction is the state of mind of being convinced. So if you are convinced that the defendant committed these charges and you don't see that feeling changing any time down the road, then I have proven the case to you beyond a reasonable doubt. [¶] Proof beyond a reasonable doubt is not proof beyond all possible doubt, because everything in life is open to some possible or imaginary doubt. There is doubt in everything."

Later in her closing, the prosecutor stated that the jury should view the "evidence as a whole," providing the following "analogy": "Imagine when you got—you were chosen as a juror, you were first sworn in, you sit down in your seats and you haven't heard any evidence, and there's a box in front of all of you. And the box is empty because you haven't heard any evidence. The defendant is not guilty at that point. He's presumed innocent. [¶] Once the trial starts, witnesses sit here and they start telling you things and giving you facts, and you're taking that evidence and you're putting it in the box. [¶] And at the end of the trial, you have a box full of evidence. And what do you do with it? The defendant wants you to pull out one piece of evidence, maybe (Jane Doe 1)'s testimony, and hold it up and twist it around and look for all of the little problems with it and decide that you have a reasonable doubt as to what happened here. [¶] But that's not how you look at the evidence. You take out every piece from that box, and you look at it together as a whole. And you see what is reasonable when you're looking at all the evidence together. And you don't get to say, hey, there's something that's not in my box. I would really like to put some DNA in my box. I would really like to put a tape of the incident in the box. [¶] You may want those things, but you're not looking at what you don't have. You're looking at whether what you do have in your box convinces you beyond a reasonable doubt that the defendant is guilty."

In his closing argument, defense counsel discussed at length the prosecution's burden to prove the charges beyond a reasonable doubt—"the highest level of proof we have in the entire court system"—comparing it to lesser legal burdens and everyday decision making. He reiterated that it was the prosecutor's "obligation to prove the case beyond a reasonable doubt, not my obligation to prove innocence." "It's not: What do I think happened? It's

34

not what does my gut tell me?  It's not who do I believe more?  It's:  Did the government prove the case beyond a reasonable doubt?  That's the only question for you to answer."  "The burden of proof remains on [the prosecutor], and it remains that high, like we talked about, beyond a reasonable doubt."

The prosecutor responded in rebuttal:  "What [defense counsel] just put up there, that's not reasonable doubt.  Those are *reasons to doubt*.  That is not the same thing as having a reasonable doubt about the truth of a charge. My burden is to prove this case to you beyond a reasonable doubt.  [¶]  That's proof that leaves you with an abiding conviction in the truth of the charge." (Italics added.)  Later, she elaborated:  "This whole entire investigation, the trial, this is not something people would voluntarily bring upon themselves and their kids.  If they did, they wouldn't take it this far.  That is simply not reasonable.  [¶]  If you have a doubt, ladies and gentlemen, ask yourselves, is *that doubt reasonable in light of all of the evidence we've heard*?  Is it reasonable that because there's no goggles found in the house from 2006 that the defendant is not guilty?  No, that is not reasonable.  [¶]  Is it reasonable because we didn't have it from a teacher who sensed that one of the girls had been molested, that that means the defendant is not guilty?  No.  That is not reasonable.  [¶]  Is it reasonable to believe that three girls would go through all of this for no reason?  It's not reasonable.  [¶]  The only reasonable conclusion is that this happened, and it's terrible that it happened.  And we don't want to believe that things like this happened.  But you've heard the evidence that it did, and that evidence that you've heard is enough evidence to prove the case beyond a reasonable doubt."  (Italics added.)

In rejecting Gonzalez's new trial argument that the prosecutor committed prejudicial misconduct in this case in her rebuttal remarks, the

trial court opined: "[The prosecutor] repeatedly, throughout her closing argument—and we all throughout the case, repeatedly from voir dire to closing argument—told the jury about a million times that the burden of proof is beyond a reasonable doubt. But in her argument, [the prosecutor] never strayed from that standard of proof and never suggested there was any other standard of proof. [¶] She did argue that the defense's theory was not reasonable in light of all the evidence and the People's case was more reasonable when you look at all the evidence. But that argument was expressly approved by the Supreme Court in [*Centeno*] at page 673. [¶] Here, . . . unlike the prosecutor in [*Centeno*], [our prosecutor] did not conflate the idea of rejecting unreasonable inferences offered by the defense and suggest that rejecting those inferences would meet her burden of proof on every element. She clearly reminded the jury that she was required to prove every element beyond a reasonable doubt. And my view of the evidence of the case as a whole is that there is no danger, no possibility that the jury ever misunderstood that the People were required to prove their case beyond a reasonable doubt."

### 2. *Legal Framework*

A prosecutor "enjoys wide latitude in commenting on the evidence, including urging the jury to make reasonable inferences and deductions therefrom." (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353.) "However, 'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its . . . obligation to overcome reasonable doubt on all elements [citation].' " (*Centeno, supra*, 60 Cal.4th at p. 666.) "[W]hen a claim of prosecutorial misconduct 'focuses upon comments made by the prosecutor before the jury, the question [of the comments' prejudicial impact] is whether there is a reasonable likelihood that

the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Pierce* (2009) 172 Cal.App.4th 567, 572 (*Pierce*), quoting *People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).) "In conducting this inquiry, we 'do not lightly infer' that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]" (*Centeno*, at p. 667.)

In *Centeno*, the prosecutor argued to the jury that, when it deliberated: "There is the impossible, which you must reject, the impossible [*sic*] but unreasonable, which you must also reject, and the reasonable possibilities, and *your decision has to be in the middle*. It has to be based on reason. It has to be a *reasonable account*." (*Centeno*, *supra*, 60 Cal.4th at p. 665–666, italics added.) The prosecutor also asked the jury several questions: " 'Is it reasonable to believe that a shy, scared child who can't even name the body parts made up an embarrassing, humiliating sexual abuse, came and testified to this in a room full of strangers *or the defendant abused Jane Doe. That is what is reasonable, that he abused her.*' " (*Id.* at p. 671. Italics added by *Centeno*.) And "[i]s it reasonable to believe that the defendant is being set-up . . . *or he*['*s*] *good for it? That is what is reasonable. He's good for it.*" (*Id.* at p. 672, italics added by *Centeno*.)

The Supreme Court found that the prosecutor's argument "strongly implied that the People's burden was met if its theory was 'reasonable' in light of the facts supporting it." (*Centeno*, *supra*, 60 Cal.4th at p. 671.) It held that it was misconduct to "urge[] the jury to convict based on a 'reasonable' view of the evidence." (*Id.* at p. 662.) The Court recognized that "[i]t is permissible to argue that the jury may reject impossible or unreasonable interpretations of the evidence and to so characterize a defense theory. (*Id.* at p. 672.) Thus, "the prosecution can surely point out that

37

interpretations proffered by the defense are neither reasonable nor credible." (*Id.* at p. 673.) The *Centeno* prosecutor erred because "she confounded the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt. She repeatedly suggested that the jury could *find defendant guilty* based on a 'reasonable' account of the evidence." (*Ibid.*) And "[t]hese remarks clearly diluted the People's burden." (*Ibid.*)

### 3.  *No Prejudicial Misconduct in this Case*

Preliminarily, we note that defense counsel did not object to the prosecutor's comments during argument. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*Samayoa, supra,* 15 Cal.4th at p. 841.) However, Gonzalez also argues that defense counsel's failure to object constituted ineffective assistance of counsel, and so we consider his misconduct claims through that lens.

First, we see no error in the prosecutor's elaboration on what constitutes an "abiding conviction" for purposes of the reasonable doubt standard of proof. In stating that abiding means "lasting" and conviction means being "convinced," so that an abiding conviction means "you are convinced that the defendant committed these charges and you don't see that feeling changing any time down the road," the prosecutor was merely suggesting well-established alternate definitions for the words. "The United States Supreme Court and the California Supreme Court, respectively, have described 'an abiding conviction' as one that is 'settled and fixed' [citation] and one that is 'lasting [and] permanent' [citation]." (*Pierce, supra,* 172 Cal.App.4th at p. 573.) And other appellate courts have found no misconduct

38

under similar circumstances. (Compare *People v. Cowan* (2017) 8 Cal.App.5th 1152, 1162 (*Cowan*) [prosecutor's statement "that beyond a reasonable doubt means 'you're firmly convince[d] that guilt is the only reasonable interpretation of the evidence' " is an "accurate statement of the meaning of beyond a reasonable doubt"]; *Pierce*, at p. 573 [no misconduct where "prosecutor's challenged statements concerning 'an abiding conviction' . . . evoked a certain 'permanen[ce]' in that each juror's conviction that the charge was true had to be 'permanent' in that, considering the law and the facts presented, that conviction would 'abide,' that is, would not change, through the end of the trial when the jury rendered its verdict"].)

Nor do we find error in the prosecutor's box analogy. The prosecutor was simply making the point that the jury should look at all of the evidence as a whole, even if there is other evidence it might have liked to have been presented: "You're looking at whether what you do have in your box convinces you beyond a reasonable doubt that the defendant is guilty." This is a correct statement of the law. (See *Centeno*, *supra*, 60 Cal.4th at p. 672 ["It is permissible to urge that a jury may be convinced beyond a reasonable doubt even in the face of conflicting, incomplete, or partially inaccurate accounts."]; *ibid.* ["It is certainly proper to urge that the jury consider all the evidence before it."].)

We also reject Gonzalez's final misconduct claim— that the prosecutor improperly suggested she could meet her burden of proving the charges beyond a reasonable doubt if her theory of the case was "reasonable." In making the challenged statements in her rebuttal argument, the prosecutor was stressing that the flaws in the evidence pointed out by defense counsel in his closing did not create reasonable doubt because they were simply "reasons to doubt" that were not reasonable. The prosecutor stated: "If you have a

doubt, ladies and gentlemen, ask yourselves, is *that doubt reasonable in light of all of the evidence we've heard*?" (Italics added.) She listed a number of suggested defense inferences supporting Gonzalez's claimed innocence—that the victims were lying, that no goggles were found, that there were no reports of molest from teachers—and stated they were not reasonable inferences and thus did not support a finding of reasonable doubt. The prosecutor then concluded that the "only reasonable conclusion" is "that this happened" and argued to the jury: "[Y]ou've heard the evidence that it did, and the evidence that you've heard is enough evidence to prove the case beyond a reasonable doubt."

Unlike the prosecutor in *Centeno*, the prosecutor here was not improperly conflating the concept of rejecting unreasonable inference with the standard of proof beyond a reasonable doubt. Rather, she was arguing that the jury should reject the unreasonable interpretations of the evidence suggested by the defense and accept the only reasonable interpretation left— that Gonzalez was guilty beyond a reasonable doubt. This did not constitute misconduct. (See *Centeno, supra,* 60 Cal.4th at p. 672 [approving argument that "the jury must 'decide what is reasonable to believe versus unreasonable to believe" and to ' "accept the reasonable and reject the unreasonable' " because '[n]othing in [that] explanation lessened the prosecutions burden of proof' "]; *People v. Jasmin* (2008) 167 Cal.App.4th 98, 114-116 [finding "not objectionable" comments that the "there is but one reasonable choice to make" and urging jury to apply its "reason" to the facts and not do the "unreasonable thing"].)[9] Certainly, given the repeated references to the

_____

[9] *Cowan, supra,* 8 Cal.App.5th 1152, cited extensively by Gonzalez, actually supports our conclusion. In that case, the jury asked a series of questions suggesting it was reasonable to infer the defendant's guilt from various facts in evidence. (*Id.* at p. 1161–1162.) Immediately before these

reasonable doubt standard by both parties and the court, we see no
" 'reasonable likelihood that the jury construed or applied any of the
complained-of remarks in an objectionable fashion.' " (*Pierce*, *supra*, 172
Cal.App.4th at p. 572.)[10]

## D.     *The Sentence is not Unconstitutionally Disproportionate*

Gonzalez finally argues that the trial court's sentence constitutes cruel
and unusual punishment under the Eighth Amendment of the United States
Constitution and article I, section 17 of the California Constitution.
Specifically, Gonzalez asserts that an effective life sentence without the
possibility of parole based on his non-homicide crimes is unconstitutionally
disproportionate. While the sentence is severe, we are not persuaded it is
unconstitutional.

### 1.     *Additional Background*

---

questions, the prosecutor had reiterated that " '[b]eyond a reasonable doubt
simply means that . . . after consideration of all the evidence in totality you're
firmly convince[d] that guilt is the only reasonable interpretation of the
evidence.' " (*Id.* at p. 1161.) The appellate court found no prosecutorial error
because the "jury would understand the prosecutor's discussion of the
reasonable interpretation of the evidence to be linked to her statement that
the jury must be firmly convinced that guilt is the only reasonable
interpretation of the evidence." (*Id.* at p. 1162.) Similarly, here, *during* the
challenged statements questioning the reasonableness of the defense
arguments, the prosecutor urged the jury: "If you have a doubt, ladies and
gentlemen, ask yourselves, is *that doubt reasonable in light of all of the
evidence we've heard*? (Italics added.) She then stated guilt was the only
reasonable conclusion and reiterated her burden of proof. Clearly, the jury
would have understood her discussion of unreasonable interpretations of the
evidence to be linked to these other statements.

[10] Because we have rejected Gonzalez's claims of prosecutorial error,
we again find no ineffective assistance of counsel. (*Bradley*, *supra*, 208
Cal.App.4th at p. 90 [failure to make a meritless objection is not ineffective
assistance].) By separate order, we have also denied Gonzalez's related
petition for habeas corpus (A163644), which raises the same claims.

In its sentencing memorandum, the prosecution calculated Gonzalez's maximum potential prison sentence as a determinate term of 16 years, eight months, with an indeterminate term of 900 years to life. It recommended that the maximum sentence be imposed in the case, arguing that the nature of the crimes, the extended time period over which they were committed, the age and vulnerability of the victims, and Gonzalez's abuse of his position of trust in the household all favored the highest possible punishment. Defense counsel submitted a sentencing memorandum claiming that the prosecution had overestimated the potential indeterminate term and requesting a lower determinate term. According to defense counsel, however, even if the court accepted the defense's calculation and imposed the lesser indeterminate sentence of 120 years to life, the sentence would still be the functional equivalent of life without the possibility of parole and therefore unconstitutionally disproportionate under both state and federal law. Defense counsel requested a sentence functionally equivalent to life *with* the possibility of parole.

At the sentencing hearing on August 16, 2019, Jane Doe 1 gave a victim impact statement. The court explained that, to avoid any ex post facto issues, it was applying the lesser penalty of 15 years to life for all of the enhanced offenses which occurred prior to September 10, 2010, the date when the penalty was raised from 15 to 25 years to life. In addition, prior to November 8, 2006, any section 269, subdivision (a) convictions were not mandated to run consecutively. Defense counsel argued that, despite the court's reductions, the Eighth Amendment was still implicated "because of the monumental stacking and the cumulative effect of these extra crimes, that they basically sentence [Gonzalez] to life without the possibility of parole." In his view, the statutory method of calculating the sentence was

42

"absurd" and "cruel and unusual"—giving child molesters longer sentences than murderers—and thus unconstitutional.

The trial court first denied probation, noting Gonzalez was ineligible under sections 667.61, subdivision (h) and 1203.066, subdivision (a)(1) and (7) and that, in any event, probation was "obviously" not appropriate. The court next found that the crimes involved a high degree of cruelty and callousness, given the ages of the children and the duration of the abuse, stating: "[S]tarting at that young age, to harm children day after day after day, and essentially taking away their childhood and exposing them to the fear, the self-doubt, the questioning, the lifelong trauma and all the other ramifications of this conduct, in my view, takes this case beyond the average child molestation." The court also found the victims more vulnerable than in the average child abuse case given that they were often left alone with Gonzalez and received no help after reporting the abuse to adults. It found that the crimes indicated planning, such as luring the victims into the bathroom or other rooms, using blindfolds, promising treats, and separating the children from others in order to molest them. And it concluded Gonzalez took advantage of a position of trust in committing the offenses in "about as fundamental a violation of trust as one can engage in."

The court concluded that the frequency and duration of Gonzalez's crimes, including the fact that he molested his own daughter decades ago, indicated that he was a serious danger to society. In mitigation, the court found that Gonzalez had a relatively minor criminal history and had performed satisfactorily on probation. With respect to current versus consecutive sentencing, the court noted that each instance of molestation was a separate act of violence against a child done to gratify Gonzalez's sexual desires, and all occurred at different times and different locations.

43

The trial court imposed a determinate sentence of 18 years, eight months, and a consecutive indeterminate sentence of 695 years to life—sentences of 25 years to life on counts 33, 42, and 45 through 47; and 15 years to life for counts 1 through 4, 7 through 18, 20 through 32, 35 through 41, 43, and 44. In doing so, the court rejected Gonzalez's constitutional claim, reasoning: "Every court that has faced the issue in these serious multiple child molestation cases has found that the sentences mandated by the Legislature are not cruel and unusual. And although I understand the comparison to murder cases, it's very hard to put a number on the damage this does to three children for decades and the resulting trauma for the rest of their lives."

## 2. *Eighth Amendment Claim*

It is "firmly established that '[t]he concept of proportionality is central to the Eighth Amendment,' and that '[e]mbodied in the Constitution's ban on cruel and unusual punishments is the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." ' " (*In re Coley* (2012) 55 Cal.4th 524, 538 (*Coley*), quoting *Graham v. Florida* (2010) 560 U.S. 48, 59 (*Graham*).) Thus, "[a] punishment violates the Eighth Amendment if . . . it is 'grossly out of proportion to the severity of the crime.' " (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230 (*Retanan*).) When the length of a particular sentence is challenged, "the Court considers all of the circumstances of the case to determine whether the sentence is unconstitutionally excessive." (*Graham*, at p. 59.)

When considering whether a sentence is "grossly disproportionate," we "must begin by comparing the gravity of the offense and the severity of the sentence." (*Graham*, *supra*, 560 U.S. at p. 60.) "Outside the context of capital punishment, successful challenges to the proportionality of particular

44

sentences have been exceedingly rare." (*Rummel v. Estelle* (1980) 445 U.S. 263, 272 (*Rummel*).) Indeed, the United States Supreme Court has upheld life sentences imposed for relatively minor offenses such as the third-strike theft of a few golf clubs. (See *Ewing v. California* (2003) 538 U.S. 11 (*Ewing*).)

If " '[i]n the rare case' " an " 'inference of gross disproportionality' " can be drawn, "the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions." (*Graham, supra,* 560 U.S. at p. 60.) It is only where "this comparative analysis 'validate[s] an initial judgment that [the] sentence is grossly disproportionate,' " that the sentence will be found unconstitutional under the Eighth Amendment. (*Ibid.*) " 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358; accord *People v. Edwards* (2019) 34 Cal.App.5th 183, 190 (*Edwards*).)

The sentence in this case is no doubt severe. On the other side of the scale, however, the sheer number of Gonzalez's multiple sex offenses, committed over more than a decade against three very vulnerable victims, all of whom testified they were under the age of 5 when the abuse started, weigh heavily against him. In addition, Jane Doe 1 testified that the incidents which formed the basis for the charges were "just a very small portion" of the totality of what occurred over the years. Further, Gonzalez made threats, including threats of physical harm, when faced with discovery, and, as the trial court expressly found, the manner in which Gonzalez committed the numerous offenses evinced a high degree of cruelty and callousness. The

45

court concluded he was a serious danger to society. Consideration of all of these circumstances does not lead us to an " 'inference of gross disproportionality'. " (*Graham, supra,* 560 U.S. at p. 60.) Consequently, Gonzalez's Eighth Amendment claim fails at the outset, and we need not conduct a comparative analysis.

### 3. *State Constitutional Claim*

"California's prohibition on 'cruel or unusual punishment' (Cal. Const., art. 1, § 17) has been read to bar any sentence ' "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' (*People v. Boyce* (2014) 59 Cal.4th 672, 721, italics omitted (*Boyce*), quoting *In re Lynch* (1972) 8 Cal.3d 410, 424 [(*Lynch*)]." (*People v. Brewer* (2021) 65 Cal.App.5th 199, 213 (*Brewer*).) "Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*Lynch*, at pp. 423–424.)

"California courts examine three criteria in assessing disproportionality: (1) the nature of the offense and offender, with emphasis on [his or her] danger to society; (2) the penalty imposed compared with the penalties for more serious crimes in California; and (3) the punishment for the same offense in other jurisdictions." (*Brewer*, *supra*, 65 Cal.App.5th at

pp. 213–214; accord, *Lynch*, supra, 8 Cal.3d at pp. 425–427.) "In examining the nature of the offense, we ' "look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts." ' [Citation.] In examining the nature of the offender, we consider ' "whether 'the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' " ' " (*People v. Gomez* (2018) 30 Cal.App.5th 493, 500.)

We have previously considered the circumstances surrounding the many offenses in this case and have concluded that we could not draw an inference of gross disproportionality when compared to the severity of Gonzalez's sentence. We see nothing in Gonzalez's personal characteristics that changes this calculus. Gonzalez, the sole culpable party, was an adult when the crimes were committed. Moreover, he expressed no remorse for his repeated acts of molestation. Indeed, at one point Gonzalez described his abuse to Jane Doe 1 as "so small" he was not going to jail because of it. And the trial court found him to be a serious danger to society.

Nevertheless, Gonzalez contends that the penalty imposed—essentially life without the possibility of parole—is disproportionate because it is the same as, or even more severe than, the penalties for murder in this state.[11] Implicit in Gonzalez's argument is the assumption that the multiple acts of sexual molestation of which he was convicted are less serious than a single

---

[11] Gonzalez makes no effort to compare his sentence with punishments in other states for the same offenses, which we take as a concession that his sentence withstands constitutional challenge on that basis. (See *Retanan*, *supra*, 154 Cal.App.4th at p. 1231 [defendant bears burden of establishing disproportionality].)

murder conviction.  However, "[t]he penalties for single offenses . . . cannot properly be compared to those for multiple offenses."  (*People v. Crooks* (1997) 55 Cal.App.4th 797, 807.)  Rather, "[r]ecidivism in the commission of multiple felonies poses a danger to society justifying the imposition of longer sentences for subsequent offenses." (*People v. Cooper* (1996) 43 Cal.App.4th 815, 823–824.)  Among the primary goals of recidivist statutes are "to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time."  (*Id.* at p. 824.) And as the United States Supreme Court has stated:  "[W]e have repeatedly upheld recidivism statutes 'against contentions that they violate constitutional strictures dealing with . . . cruel and unusual punishment.' " (*Parke v. Raley* (1992) 506 U.S. 20, 27.)  That Gonzalez was convicted of all of the offenses at the same time is irrelevant to the purposes underlying recidivist statutes, as the timing of the discovery of the multiple acts, and of the prosecutions and convictions, was pure happenstance.

Moreover, "[t]here exists a strong public policy to protect children of tender years."  (*People v. Olson* (1984) 36 Cal.3d 638, 646.)  "[L]ewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806.) Sexual offenses against minors "may have lifelong consequences to the well-being of the child."  (*Ibid.*)  Thus, section 667.61 reflects the Legislature's "intolerance toward child sexual abuse." (*People v. Wutzke* (2002) 28 Cal.4th 923, 931.)  Moreover, "persons convicted of sex crimes against multiple victims within the meaning of section 667.61, subdivision [(e)(4)] 'are among the most dangerous' from a legislative standpoint." (*Id.* at pp. 930–931.)

Consequently, "[t]he One Strike scheme . . . contemplates a separate life term for each victim attacked on each separate occasion." (*Id.* at p. 931.)

Given these considerations, numerous courts have upheld sentences in multiple child molestation cases that exceed the lifetime of the defendant and thus amount to a sentence of life without the possibility of parole. (See, e.g., *Retanan, supra,* 154 Cal.App.4th 1219, 1222, 1231 [upholding sentence of 135 years to life for 16 felony offenses arising from the molestation of four children]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 532 [affirming sentence 129-year sentence for 25 counts of sexual assault on his step-daughter]; compare *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1130, 1134–1137 [affirming sentence of 375 years to life plus 53 years based on third strike conviction for 19 felonies involving the violent sexual assault of three women].) As stated above, we should not interfere with the Legislature's choice of fitting and proper penalties "unless a statute prescribes a penalty 'out of all proportion to the offense.' " (*Lynch, supra*, 8 Cal.3d at pp. 423–424.) We see nothing in Gonzalez's extended and extensive sexual victimization of his three young victims which causes us to second guess the proportionality of the Legislature's penalty determination. (See *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1375–1376, 1383 [determinate sentence of 115 years, plus an indeterminate sentence of 444 to life for 12 counts of robbery, mayhem, attempted murder, and possession of a firearm by a felon does not constitute cruel and unusual punishment; sentence "serves valid penological purposes: it unmistakably reflects society's condemnation of defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future"].)

## III. DISPOSITION

The judgment is affirmed.

WISS, J.*

WE CONCUR:

HUMES, P. J.

BANKE, J.

A158781N

---

* Judge of the San Francisco Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.